[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14635

_____

D.C. Docket No. 3:03-cv-00237-TJC-TEM

WILLIAM GREG THOMAS,

Petitioner - Appellant,

versus

ATTORNEY GENERAL, STATE OF FLORIDA,
SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 31, 2021)

Before WILLIAM PRYOR, Chief Judge, and LAGOA and ED CARNES, Circuit
Judges.

LAGOA, Circuit Judge:

William Greg Thomas, a Florida prisoner convicted and sentenced to death for the kidnapping and first-degree murder of his wife, appeals the district court's denial of his federal habeas petition following our remand in *Thomas v. Attorney General*, 795 F.3d 1286, 1296–97 (11th Cir. 2015). In that decision, we directed the district court to conduct a more thorough analysis of whether Thomas was entitled to equitable tolling of the Antiterrorism and Effective Death Penalty Act's ("AEDPA") one-year statute of limitations for filing his federal § 2254 habeas petition. Following our remand, the district court again concluded that Thomas was entitled to equitable tolling beginning in April 2003, deemed the petition timely filed, and denied Thomas's petition on the merits. For the reasons discussed below, we conclude that Thomas is entitled to equitable tolling as he demonstrated that he exercised reasonable diligence in pursuing his rights and he further demonstrated extraordinary circumstances—his counsel, Mary Catherine Bonner's abdication of her duty of loyalty to Thomas so she could promote her own interests—that prevented the filing of his petition. Indeed, Thomas's counsel's interests were so adverse to those of her client that Bonner effectively abandoned Thomas. Turning to the merits of the petition, the district court correctly ruled that Thomas procedurally defaulted on his first two claims and the state court reasonably denied relief on his third claim. We therefore affirm the denial of Thomas's petition.

2

I.    FACTUAL AND PROCEDURAL BACKGROUND

   A. State Court Proceedings

      1. Trial and Direct Appeal

The Florida Supreme Court previously explained the essential facts of this

case as follows:

> Thomas planned the kidnapping and murder of his wife, Rachel,
> in order to avoid paying his part of a settlement agreement in their
> pending divorce. Thomas and a friend, Douglas Schraud, went to
> Rachel's house, September 12, 1991, the day before a substantial
> payment was due, and Thomas beat, bound, and gagged Rachel. When
> Rachel tried to escape by hopping outside, Thomas knocked her to the
> ground and dragged her back inside by her hair. He then put her in the
> trunk of her car and drove off. She was never seen again.

*Thomas v. State* (*Thomas I*), 693 So. 2d 951, 951 (Fla. 1997). Thomas was charged

with first-degree murder, burglary, and kidnapping, and Richard Nichols ("Nichols")

was appointed to represent Thomas at trial. *Id.* During the guilt phase of the trial,

"[t]he State presented numerous witnesses to whom [Thomas] had made

incriminating statements," including Thomas's accomplice, Schraud. *See id.* at 951–

52, 952 n.3. Thomas presented no evidence during the guilt phase. *Id.* at 951. The

jury found Thomas guilty on all counts. *Id.*

   During the penalty phase, a Florida jury recommended death by an eleven-to-

one vote, and the Florida trial court imposed a sentence of death based on five

aggravating circumstances and zero mitigating circumstances. *Id.* The Florida trial

court found the following five aggravators:

(1) Thomas had previously been convicted of murdering his mother, Fla. Stat. § 921.141(5)(b); (2) the murder was committed in the course of a burglary, *id.* § 921.141(5)(d); (3) the murder was committed for pecuniary gain, *id.* § 921.141(5)(f); (4) the murder was especially heinous, atrocious, or cruel, *id.* § 921.141(5)(h); and (5) the murder was committed in a cold, calculated, and premeditated manner, *id.* § 921.141(5)(i).

*Thomas*, 795 F.3d at 1288; *accord Thomas I*, 693 So. 2d at 951 n.1. As to the aggravator that Thomas had previously been convicted of murdering his mother, Elsie Thomas, Thomas had entered a guilty plea in Florida circuit court case number 93-5393 on the charge of first-degree murder of Elsie prior to his sentencing in the instant case. The State presented evidence during the penalty phase of Thomas's trial in the instant case that Thomas murdered his mother to prevent her from talking to the police about Rachel's death. *Thomas I*, 693 So. 2d at 953. As part of the written plea agreement in his mother's murder case, Thomas "agree[d] to waive [his] rights to appeal any matter whatsoever arising out of [Rachel's murder case] whether direct, colarteral [sic] on appeals under [Florida Rule of Civil Procedure 3.850]," but "specifically reserve[d] the right to appeal matters concerning the sentencing in [Rachel's murder case]."

On direct appeal to the Florida Supreme Court, Thomas raised the following claims: (1) the State failed to prove the corpus delicti; (2) the sentencing order was deficient; (3) the jury instruction on the cold, calculated, and premeditated ("CCP") aggravator was faulty; (4) the prosecutor misinformed the jury about the weighing

process for aggravators and mitigators; (5) the trial court improperly informed the jury on the weighing process; (6) the jury instruction on the heinous, atrocious, or cruel ("HAC") aggravator was faulty; (7) the prosecutor made improper closing comments; (8) the trial court used the felonies underlying the murder conviction as an automatic aggravator; and (9) the evidence was insufficient to support the pecuniary gain aggravator. *Thomas I*, 693 So. 2d. at 951 n.2. The Florida Supreme Court affirmed Thomas's convictions and sentence of death. *Id.* at 953. Regarding Thomas's first claim, the Florida Supreme Court determined that "the State introduced sufficient evidence to prove the corpus delicti of the murder and to lay the predicate for admission of Thomas's inculpatory statements." *Id.* at 952. As to Thomas's second claim, the Florida Supreme Court found that the trial court had failed to address mitigating evidence in its sentencing order but that the error was harmless, as the evidence of aggravation in the case was "massive." *Id.* at 953. The Florida Supreme Court found Thomas's remaining claims to be either not preserved or without merit. *See id.* at 953 & nn.4–5. On November 17, 1997, the United States Supreme Court denied Thomas's petition for writ of certiorari, *Thomas v. Florida*, 522 U.S. 985 (1997), at which point his conviction and sentence became final and AEDPA's one-year statute of limitations began to run.

2. Postconviction Evidentiary Hearing and Appeal

On October 5, 1998, Thomas filed his first motion for postconviction relief in state court. That motion, which was filed 321 days after his petition for writ of certiorari was denied, tolled the running of AEDPA's limitations period. On April 19, 2000, Thomas filed an "Amended Motion to Vacate Judgment and Sentence" (the "Amended Postconviction Motion"). In the Amended Postconviction Motion, Thomas raised the following claims: (1) Thomas's "sentencing jurors were repeatedly misinformed and mislead [sic] by instructions and arguments which unconstitutionally and inaccurately diluted their sense of responsibility for sentencing contrary to the Eight and Fourteenth Amendments," and defense counsel's failure to object and adequately litigate this issue was ineffective assistance of counsel; and (2) Thomas was denied the effective assistance of counsel at the guilt and sentencing phases of his trial.

As to his second claim, Thomas identified numerous instances of alleged ineffective assistance by his appointed trial counsel, Nichols, including: (1) Nichols was unprepared for the penalty phase and had "little or no discussions with the defendant prior to said penalty phase"; (2) Nichols did not adequately discuss with Thomas that he could testify in his defense; (3) Nichols did not interview witnesses Thomas identified; (4) Nichols's pretrial preparation was inadequate, as he only visited Thomas a few times prior to trial and, during those visits, Thomas noticed

"the odor of alcohol on [Nichols's] breath"; (5) Nichols failed to investigate the primary motive presented by the State that Thomas "was required pursuant to a civil divorce judgment to pay sums of money to [his wife]," as Nichols did not have Harry Mahon, Thomas's civil counsel, testify at trial that Thomas had already given the sum of money to Mahon for payment to Rachel; (6) Nichols failed to object to the CCP aggravator instruction; (7) Nichols failed to object to certain comments made by the prosecutor and the state trial court to the venire panel about the death penalty; (8) Nichols failed to object to the HAC aggravator instruction; (9) Nichols failed to object to the prosecutor's improper comments made during closing argument; (10) Nichols failed to object to the use of the felonies underlying the murder as qualifying as an "automatic aggravator"; and (11) Nichols failed to argue that the evidence was insufficient to support a finding that the murder was committed for pecuniary gain. On August 15, 2000, Thomas filed an Addendum to the Amended Postconviction Order with two additional claims: (1) at the conclusion of the trial, Nichols failed to object to the prosecutor dropping a hangman's noose on the counsel table, which greatly prejudiced the jury; and (2) Nichols did not inform Thomas that "a guilty plea relative to the charge of murder (wherein his mother was the victim) could result in an aggravating circumstance in the penalty phase of the murder trial relative to his wife."

On January 29, 2001, the state postconviction court held an evidentiary hearing. At the start of the hearing, the State "agreed, in an abundance of caution, that [the postconviction court] should hold an evidentiary hearing on the defendant's claims . . . , but by doing so, . . . [did] not waive any claims of procedural bar or waiver," and further stated that many of Thomas's claims were in fact "procedurally barred as claims that could and should have been raised at trial and on direct appeal and [were] only addressable to the extent that the defendant [could] establish ineffective assistance of trial counsel by failing adequately to present these issues or to preserve them for review," and that Thomas had "waived the right to raise any issues arising out of the guilt phase of [the] trial, including ineffective assistance of counsel issues." At the hearing, four individuals testified: Mahon, Nichols, Lance Day (the prosecutor in the case), and Thomas. In its post-hearing memorandum, the State argued that because Thomas had waived his right to raise any claims relating to the guilt phase in Rachel's murder case as part of his guilty plea in his mother's murder case, all claims relating to ineffective assistance of counsel in the guilt phase should be denied as being waived.

On April 26, 2001, the state postconviction court entered an order denying Thomas's Amended Postconviction Motion. Of relevance to this appeal, the postconviction court found that Thomas had specifically waived his right to appeal any guilt phase matters, including ineffective assistance of counsel claims, under the

plea agreement in his mother's murder case, which Thomas entered knowingly and voluntarily. Regarding Thomas's claim that Nichols was ineffective for failing to call Mahon as a witness to challenge the motive presented by the State for the murder, the postconviction court determined that Nichols was not ineffective in this manner, finding that Nichols's testimony was more credible than Thomas's allegations. The postconviction court noted that Nichols testified that he had discussed with Thomas the possibility of calling Mahon to testify, "but that they *both* agreed that the benefits of that testimony would not outweigh the loss of the final closing argument," and that it was a "tactical decision based upon what [Nichols] felt the facts of the case supported." (emphasis in original). Turning to the claim that Nichols failed to object to improper prosecutorial comments during closing argument, the postconviction court noted that Nichols explained his position on continuous objections by stating that "no lawyer can maintain any credibility with a jury if they're jumping up and down every word or two that goes on" and that "sometimes when you let a prosecutor do something that may be objectionable, it may create an opportunity for you to make a more beneficial point or more effective point in response to them." As such, the court found that Thomas had failed to demonstrate that Nichols's failure to object was not a reasonable tactical decision.

The postconviction court also denied the second claim in Thomas's Addendum to his Amended Postconviction Motion, i.e., that Nichols was ineffective

9

for failing to advise Thomas that his guilty plea in his mother's murder case could serve as an aggravator in his wife's murder case. The postconviction court found Nichols's testimony that he had discussed with Thomas that Elsie's murder could be used as an aggravator in Rachel's murder case and that Thomas "wanted to go forward with it anyway" to be more credible than Thomas's testimony that Nichols had not informed him of the potential aggravator. The court noted that Nichols testified that he recommended this course of action because "it appeared to [him] that a death penalty was more likely to be upheld . . . in the case where [Thomas] was accused and pled guilty to killing his mother" and "secur[ing] a life sentence" in his mother's murder case, therefore, would benefit Thomas. The court also found Thomas's testimony to be "rehearsed," noting that Thomas had "lapses of memory in response to critical questions propounded by the State at the hearing."

Thomas appealed the denial of his Amended Postconviction Motion to the Florida Supreme Court. *Thomas v. State* (*Thomas II*), 838 So. 2d 535 (Fla. 2003). In his appeal, Thomas argued, for the first time, that the plea waiver in his mother's murder case "violate[d] general constitutional principles and contravene[d] public policy, or alternatively, that trial counsel in [Rachel's murder] case was ineffective in allowing him to agree to waive his rights." *Id.* at 539. The Florida Supreme Court found these newly raised claims to be procedurally barred, as they either "could have

10

or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence" or in Thomas's Amended Postconviction Motion.  *Id.*

The Florida Supreme Court then addressed Thomas's preserved claims.  Of relevance here, the Florida Supreme Court found that the state postconviction court's denial of the claim that Nichols was ineffective for not calling Mahon as a witness was not erroneous, as the court's factual findings were "supported by competent substantial evidence in the record and its rulings comport[ed] with the applicable law."  *Id.* at 541.  The Florida Supreme Court also rejected Thomas's claim that Nichols was ineffective for failing to object to the prosecutor's comments during closing argument, concluding that although "several of the prosecutor's comments . . . were improper, . . . the circuit court did not err in rejecting Thomas's ineffectiveness claim."  *Id.* at 542 n.8.  The Florida Supreme Court affirmed the denial of Thomas's remaining claims.  *Id.*

The mandate in *Thomas II* issued on March 3, 2003.  However, on July 26, 2002, Thomas had filed a successive postconviction motion in state court based on the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002). This motion was denied on April 4, 2003.  Because Thomas did not appeal the denial of the motion, AEDPA's limitations period began to run again on May 4, 2003, i.e., when the thirty-day time period for filing an appeal had passed.  This left Thomas forty-four days to file a federal habeas petition.

11

## B. Pre-remand Federal Proceedings

On March 24, 2003, Mary Catherine Bonner filed an emergency motion for pre-petition appointment on behalf of Thomas in the district court, which granted the motion and appointed Bonner as Thomas's counsel on April 2, 2003. The last day for Thomas to timely file his federal habeas petition was June 18, 2003. Bonner, however, did not file the petition until March 22, 2004. As we previously explained:

> On June 4, 2003, the court ordered [Bonner] to submit a status report within two weeks. She filed two sealed status reports in June and July, attesting that she needed "at least six weeks additional time" to file the petition. She also filed a series of sealed motions with the court, addressing investigative needs and costs. On February 19, 2004, the court—having heard nothing from Bonner about the status of the petition for seven months—ordered her once again to advise the court on the status of the case by March 15. On that date, she responded and sought leave to file Thomas's habeas petition by March 19. She eventually filed the petition on March 22, 2004. The one-year statute of limitations for filing a habeas petition, *see* 28 U.S.C. § 2244(d)(1), however, had long since passed—on June 18, 2003.

*Thomas*, 795 F.3d at 1288.

In his habeas petition, Thomas raised eight claims: (1) that he was never informed that Nichols "could not represent him on the issue of whether he entered a knowing, voluntary, informed and intelligent plea in the companion case[, i.e., his mother's murder case,] although the terms of that plea agreement foreclosed his attack, directly or collaterally, on both convictions" and, thus, was denied due process; (2) that Nichols was ineffective in his representation in Rachel's murder trial and "contrived to exonerate his own shortcomings by negotiating a plea

12

agreement in [Thomas's mother's murder] case so that his errors in [Rachel's murder] case could not be the subject of reversal or scrutiny," creating a conflict between Nichols's and Thomas's interests that violated the Sixth and Fourteenth Amendments; (3) that if Nichols was "not found to have suffered under an actual conflict of interest when he induced the plea of . . . Thomas, the facts surrounding the plea establish ineffective assistance of counsel"; (4) that Thomas's "sentencing jurors were repeatedly misinformed and misled by instructions and arguments which unconstitutionally and inaccurately diluted their sense of responsibility for sentencing" and that Nichols's failure to object and litigate the issue was ineffective assistance of counsel; (5) that "Thomas was denied the effective assistance of counsel at the guilt/innocence and sentencing phases of his trial"; (6) that Nichols failed to object to the prosecutor dropping a noose on the counsel table at the end of trial; (7) that Nichols failed to inform Thomas that a guilty plea in his mother's murder case "could result in an aggravating circumstance[] in the penalty phase of the murder trial relative to his wife"; and (8) "[t]he structure and implementation of Florida's Death Penalty is unconstitutional under *Ring v. Arizona*." Subsequently, the State filed its response, arguing that the petition was time-barred under AEDPA.

On January 18, 2006, the district court held a hearing on the issue of timeliness of the petition, at which the district court questioned Bonner on why she had not timely filed the petition. Bonner explained that "the reason that [she] . . . allowed it

13

to get close to the margin, and . . . perhaps over the margin, is that [she] felt that the court needed to be presented with all of the facts," and that she needed additional time to investigate the circumstances of Thomas's plea in his mother's murder case and to speak with several alibi witnesses. Bonner also argued that the limitations period should be equitably tolled for the time she needed to investigate those potential claims. After the hearing, the district court appointed John Mills as co-counsel for Thomas and directed the parties to file supplemental briefing on the timeliness issue.

On September 25, 2006, the district court issued an order dismissing Thomas's petition with prejudice, concluding that it was untimely and that Thomas was not entitled to equitable tolling. *Thomas v. McDonough*, 452 F. Supp. 2d 1203, 1212, 1218 (M.D. Fla. 2006). Then, on May 4, 2007, Thomas wrote a letter to the district court. In this letter, Thomas stated that Bonner had led him "to believe the time issue was a technical matter which could be 'cured at a later date'" and that the district court's ruling made "no mention of the habeas corpus form Ms. Bonner instructed [him] to fill out," which he completed on either March 25 or 26, 2003, and returned to Bonner. He also stated that "Bonner informed [him] that the Petition had been placed before the court," that it was his "belief" that Bonner had filed the petition, and that Bonner had "hid the truth" from him.

14

Thomas subsequently moved for reconsideration of his petition's dismissal. On December 17, 2007, the district court held a hearing on the motion, "at which time Bonner, in the words of the district court, 'blamed the mental and physical health of her husband and herself' for her failure to file the habeas petition in a timely fashion." *Thomas*, 795 F.3d at 1289. However, as we previously explained, Bonner's statements were in fact "more equivocal":

> Bonner began her testimony by apologizing to the court, and acknowledged that the court felt "cheated because [she] made errors." She stated that she "had what [she] believed to be reasoned decisions for filing at the time" she did. But she also explained that her husband had suffered a stroke in November 2001 that "continue[d] to prey on [her], and . . . give context to the way [she] [felt] and the way [she] acted." She clarified that she was "not saying simply, you know, my husband had a stroke, therefore, I've made a mistake." Instead, she indicated that the cumulative impact of her husband's and her own health issues may have put her under a significant amount of stress. However, she admitted that "I can't tell you whether and how that weight impacted on me." And she again stressed that she felt obliged to investigate issues Thomas had raised that were of "paramount dispositive importance."

*Id.* (alterations in original). Several days later, the district court granted Thomas's motion for reconsideration and set a limited evidentiary hearing on the issues of timeliness and equitable tolling.

On February 21, 2008, the district court held the limited evidentiary hearing, at which Thomas, Bonner, and Dave Westling, Thomas's state postconviction counsel, all testified. Thomas testified in detail as to his correspondence with Bonner about his case. Thomas stated that Bonner had sent him a letter before she

15

was appointed as his counsel "stating that she believed the best course would be to file a petition for certiorari with the U.S. Supreme Court to 'buy some time to file the 2254 [petition]'" and "explain[ing] that 'it is horrible when we have to litigate timeframes rather than substance, but, alas, that is probably where we will find ourselves.'" *Id.* (first alteration in original). "Thomas believed that Bonner 'knew everything she was talking about . . . and [his] appeal would be filed timely.'" *Id.* (alterations in original). Subsequently, in a letter dated March 19, 2003, "Bonner instructed Thomas to file a pro se § 2254 petition, doing his best to copy the issues in his state motion for postconviction relief." *Id.* Thomas testified that he had done so and had sent Bonner a signed petition dated April 3, 2003. *Id.* On April 10, 2003, Bonner sent Thomas "another letter reiterating that 'it would be better to file a Petition for Certiorari' to buy time to prepare Thomas's habeas petition so that 'we will be ready to file virtually immediately' once certiorari was denied." *Id.* Based on the letter, Thomas thought that Bonner "was on top of this, that the time bar issue was not a factor." *Id.* However, Bonner never filed a petition for certiorari from the Florida Supreme Court's denial of postconviction relief. *Id.*

On April 15, 2003, Bonner sent a letter to Thomas informing him that the limitation period had already elapsed and that "[s]ince the petition was 'already untimely,' she . . . planned to 'give it another week or so of preparation time.'" *Id.* Thomas later concluded that Bonner lied to him in this letter. *Id.* On June 4, 2003,

16

Bonner mailed Thomas a letter "laying out the steps she was taking to prepare his petition, . . . which Thomas took to mean she 'was totally on top of [the case].'" *Id.* at 1289–90 (alteration in original).  In a July 28, 2003, letter, Bonner explained to Thomas that the dates for timely filing "were long ago, and we have made a considered decision that to file a complete set of moving papers is the way to go." *Id.* at 1290.  Finally, on June 21, 2004, Bonner sent a letter to Thomas informing him that "the state had asserted that his petition was untimely, but defend[ing] her decision to file when she did because '*[w]e had to investigate; we had to follow your leads.*'" *Id.* (second alteration and emphasis in original).  She also told Thomas that the district court had "given her time to develop 'a Constitutional attack . . . on the [statute of] limitations,'" but never mentioned her health-related issues to him.  *Id.* (alterations in original).

Bonner testified that she had "no idea exactly what made [her] come to the conclusion that [time] had run out" to file the petition and "had previously believed that the statute of limitations would be tolled while a petition for certiorari to the U.S. Supreme Court was pending from Thomas's state postconviction proceedings." *Id.* (second alteration in original).  Bonner also testified that Thomas had never sent her a completed habeas petition and that the handwriting in the filed petition was her own.  *Id.*  Bonner also "expressly adopted her statements regarding her and her husband's health issues [made] at the December 17, 2007 hearing" and claimed her

17

"contradictory statements" were due to those "very severe and very overwhelming" health issues. *Id.* However, Bonner further testified that "she made a considered 'decision . . . to gather enough information for the court' to consider the issues that Thomas wished to raise" and "agreed that she was 'relying on the possibility that the court would forgive the untimeliness [of Thomas's petition] . . . based on an equitable argument.'" *Id.* (alterations in original).

On February 10, 2009, the district court issued an order concluding that the petition was untimely, but that Thomas was entitled to equitable tolling. Examining Bonner's conduct in its totality, the district court concluded that Bonner had "engaged in an egregious pattern of misfeasance" beyond gross negligence, relying on *Downs v. McNeil*, 520 F.3d 1311 (11th Cir. 2008), and *Holland v. Florida* (*Holland I*), 539 F.3d 1334 (11th Cir. 2008). The district court found that Bonner's conduct in the case was "above mere professional negligence, and [rose] to the level of bad faith," evidenced by her willful failure to timely file the petition. The district court also found Bonner was dishonest in her representation of Thomas, as she "wrote conflicting and inconsistent letters to Thomas about the [filing] deadline" and made "untrue" representations to the court about when a habeas petition would be filed. The district court further determined that Bonner had exhibited divided loyalty to Thomas by intentionally missing the statute of limitations in order to challenge the constitutionality of AEDA's limitations deadline. The district court also found

18

Thomas sufficiently diligent in pursuing his rights, as he actively participated in discussions of his case with Bonner and "took all reasonable steps to ensure the timeliness of his attempt to seek federal habeas review," including submitting to Bonner a completed, signed habeas petition for filing on April 3, 2003. Therefore, the district court deemed the petition timely filed.

Subsequently, on September 3, 2013, the district court issued an order denying Thomas's petition[1] on the merits. The district court granted Thomas a certificate of appealability as to several claims raised in Thomas's petition.

First, the district court granted a certificate of appealability regarding the claims raised in grounds two and three of Thomas's petition: (1) Nichols rendered ineffective assistance of counsel by "contriv[ing] to prevent review of his own ineffectiveness in [Rachel's murder] case by negotiating a plea agreement in [Thomas's mother's murder] case" that waived Thomas's "right to attack any guilt phase issues arising out of [Rachel's murder] trial"; and (2) even if Nichols did not have an actual conflict of interest when inducing Thomas to enter a plea in his mother's murder case, "the facts surrounding the plea establish[ed] ineffective assistance of counsel." The district court found that these claims were procedurally barred, as Thomas "did not raise any of the claims in grounds [two or three] on direct

_____

[1] On February 23, 2011, Thomas, through newly appointed counsel, moved to adopt the original petition and memorandum filed by Bonner, which the district court granted.

19

appeal or in his 3.850 motion, as amended and supplemented" and had "raised only a portion of these claims for the first time on appeal of the order denying the 3.850 motion." The district court recognized that the Florida Supreme Court had found portions of these claims procedurally barred and that those procedural bars "are regularly imposed and were not applied in an arbitrary manner." Additionally, the district court noted that Thomas had never presented the remaining parts of these claims in state court and, thus, they were unexhausted and procedurally defaulted.

Second, the district court granted a certificate of appealability as to three ineffectiveness claims raised in grounds five and seven of the petition: (1) Nichols failed to tell Thomas that his plea in his mother's murder case could be used as an automatic aggravator in his wife's murder case; (2) Nichols failed to call Mahon as a defense witness during the guilt phase; and (3) Nichols failed to object to improper arguments by the state prosecutor. As to the automatic aggravator claim, the district court noted that Thomas had failed to raise that claim in his appeal of the denial of the Amended Postconviction Motion and was thus procedurally barred. However, because the State did not raise the procedural bar, the district court reviewed the state postconviction court's ruling on the merits under AEDPA's deferential standard of review for state court rulings and denied the claim. As to the claim that Nichols was ineffective for failing to call Mahon, the district court, after examining the record and applicable law, denied the claim, finding that the state court's adjudication of

20

the claim was entitled to deference under AEDPA. Reviewing the claim that Nichols was ineffective for failing to object to improper comments during closing argument, the district court "agree[d] that some of the prosecutor's comments were improper" but concluded that the Florida Supreme Court's decision in rejecting Thomas's claim was entitled to deference under AEDPA.

The parties cross-appealed. On July 31, 2015, we issued an opinion "conclud[ing], *sua sponte*, that the proper course [was] to remand this case to the district court to make additional and detailed findings of fact concerning Thomas's claim to equitable tolling." *Thomas*, 795 F.3d at 1287. Specifically, we ordered the district court to "provide a more thorough account of the facts of this case, including those which shed light on Bonner's decisionmaking, her understanding of the AEDPA filing deadlines, her mental health, and any actions Thomas may have taken to ensure the timeliness of his petition." *Id.* at 1296–97. Additionally, we directed the district court "to apply these findings of fact to the changing landscape in the law of equitable tolling, found in the Supreme Court and this Court's recent cases," including *Holland v. Florida* (*Holland II*), 560 U.S. 631 (2010), *Maples v. Thomas*, 565 U.S. 266 (2012), and *Cadet v. Florida Department of Corrections*, 742 F.3d 473 (11th Cir. 2014), *vacated and superseded on reh'g*, 853 F.3d 1216 (11th Cir. 2017). *Thomas*, 795 F.3d at 1287. We noted that those cases had "recast the concept of 'extraordinary circumstances'" by requiring an "abandonment analysis" when

21

evaluating an equitable tolling claim based solely on attorney negligence. *Id.* at 1293. We were unable to determine from the district court's order why Bonner missed the petition filing deadline and thus whether she exhibited bad faith or divided loyalty, and we directed the district court to "consider whether Bonner's conduct amounted to an 'abandonment of the attorney-client relationship,' so that her errors may not be attributed to Thomas." *Id.* at 1293–95. Additionally, we noted that the district court did not find Bonner had acted dishonestly and had not identified "any specific willful misstatements made by Bonner that would support a finding of dishonesty." *Id.* at 1295. Furthermore, we found that the district court had not made a finding that Bonner was so impaired that it affected her decision making. *Id.* at 1295–96. Finally, we determined that the district court had "provided little factual detail to support its determination that Thomas was 'sufficiently diligent' in pursuing his rights." *Id.* at 1296.

### C. Post-remand Federal Proceedings

Following our remand, the district court ordered limited discovery, and Bonner was deposed regarding her previous health issues. Then, on May 19, 2017, the parties entered a "Joint Factual Stipulation Regarding Issue of Equitable Tolling" (the "Joint Stipulation"). In the Joint Stipulation, the parties stated that after conducting additional discovery, they "could find no definitive evidence of [Bonner's] cognitive impairment at the time of the missed deadline in 2003," and

22

instead, "the evidence and discovery . . . led to one conclusion— . . . Bonner missed the deadline as part of a deliberate strategy to challenge the constitutionality of AEDPA's statute of limitations because she was interest [sic] in invalidating AEDPA's statute of limitations itself." The parties agreed that Bonner had developed this interest "based on her own belief that the one-year statute of limitations did not allow sufficient time for investigation and preparation of a petition for writ of habeas corpus" and had "deliberately delayed filing the petition in order to use [Thomas's] case as a test case to challenge AEDPA's statute of limitations." Upon presentment of the parties' stipulation, the district court cancelled an evidentiary hearing, accepted the Joint Stipulation, and ordered supplemental briefing.

In filing his supplemental brief, Thomas attached two sworn affidavits from himself and Eric Branch ("Branch"), a fellow inmate. In his affidavit, Thomas attested that while his postconviction proceeding was pending, he had discussions with Branch and another inmate who warned him to be "mindful" of the federal habeas deadline to maintain his right to federal review. Thomas stated that he reached out to his girlfriend at the time, who contacted Bonner. Based on the information Bonner gave to his girlfriend and Bonner's resume, Thomas "believed she had a good handle on the issues and deadlines, and . . . believed at the time she would represent [him] well." After Bonner was appointed, Thomas attested that

23

Bonner directed him to prepare a habeas petition she had sent him, which he did with the aid of Branch. On April 3, 2003, Thomas signed the completed habeas petition, had it notarized, and sent it directly to Bonner for filing. Thomas attested that he believed Bonner was on top of his petition and would follow his directions to timely file the petition and accompanying pleadings and that he had no reason to believe otherwise. Thomas also attested that he had no way of accessing the district court's online docket system in prison. Thomas noted that he received a letter from Bonner a couple of weeks later "indicating that the deadline for filing the habeas petition had expired even before [he] had filed [his] state postconviction petition and that the petition was untimely" and that he believed "she had filed the petition . . . , but that it was itself late," as he had "no reason to believe that she would not have followed [his] instructions . . . or that she would lie . . . about when the actual deadline expired." Thomas attested that the first time he learned Bonner had not timely filed the petition was in the district court's order dismissing his petition as untimely and that he was "shocked" Bonner had been dishonest with him. Thomas stated that if he knew Bonner had failed to follow his direction back in April 2003, he would have immediately prepared another habeas petition to file himself before the June 2003 deadline.

In his affidavit, Branch stated that he knew Thomas for at least fifteen years. He attested that he helped Thomas complete an affidavit of indigency, copy the

24

issues raised in his state court petition into the federal habeas petition, and include a request for leave to amend the petition at a later date. Branch also attested that he aided Thomas with drafting a letter to Bonner directing her to file the petition in advance of the deadline. He also attested that he had not learned that Bonner failed to file the petition until the district court entered its order dismissing the petition and that he would have told Thomas to immediately prepare another petition to file in advance of the deadline had Bonner informed Thomas she had not done so.

On February 6, 2018, the district court issued an order deeming Thomas's petition timely filed. After recounting the long factual and procedural history of the case, the district court determined that "Bonner's pattern of intentional, unconscionable conduct in this case extends well beyond the gross negligence described in *Cadet*—it reaches into the depths of abandonment." The district court noted that "Bonner's deliberate action of delaying the filing of the Petition was directly contrary to [Thomas's] instructions and adverse to his best interests" and that, according to the parties' Joint Stipulation, Bonner's actions were done in accordance with her interest in constitutionally challenging AEDPA's statute of limitations. The district court also noted that the record evidence reflected that Bonner was "dishonest in her letters" to Thomas. The district court rejected the State's argument that Thomas should not be entitled to equitable tolling because Bonner had "unclean hands," as "when a lawyer's intentional and deceitful acts

25

result in the abandonment of the client, the client, in equity and good conscience, should not be prejudiced." Therefore, the district court found that because Bonner had "abdicat[ed] her duty of loyalty to her client to promote her own interests," she "effectively abandoned" him based on her bad faith, dishonesty, and divided loyalty to Thomas, and that, as such, Thomas had shown extraordinary circumstances for equitable tolling.

Turning to whether Thomas's exercised "reasonable diligence," the district court noted that Thomas had successfully obtained federal habeas counsel prior to the expiration of the limitations period, that Thomas "actively communicated" with Bonner, and that Thomas, "[t]rusting his experienced counsel," had no "reason to believe that she would fail to timely file his petition." The district court also noted that Bonner had not advised Thomas of her plan to intentionally miss the limitations deadline, nor was he aware she had not filed the petition he completed until September 25, 2006. The district court rejected the State's contention that Thomas should have immediately written to the court upon Bonner telling him on April 15, 2003, that the limitations deadline had passed, as Bonner claimed that it had occurred before his postconviction motion was filed in state court. Accordingly, the district court found that Thomas had shown he was reasonably diligent, "[r]egardless of whether in hindsight it can be said that there was more [Thomas] could have done."

26

Ultimately, the district court concluded that Thomas was entitled to equitable tolling beginning in April 2003 and, as such, deemed the petition timely filed. This appeal ensued.

## II.    ANALYSIS

On appeal, Thomas raises several claims. First, Thomas argues that the district court erred in finding ground two of his petition to be procedurally barred, as the district court misconstrued ground two to be a claim that Thomas was denied effective assistance of counsel when "Nichols contrived to prevent review of his own ineffectiveness in [Rachel's] murder case by negotiating a plea agreement in [Thomas's mother's] murder case." Second, Thomas claims the district court erred in ruling that ground three of his petition, i.e., that the facts surrounding the entering of the plea agreement establish that Nichols rendered ineffective assistance of counsel in Rachel's murder case, was unexhausted and procedurally barred. Finally, Thomas contends that the district court erred by giving deference to the state court's rulings under AEDPA on his claims that Nichols rendered ineffective assistance of counsel when he (1) failed to inform Thomas that the plea in his mother's murder case could be used as an aggravator, (2) failed to call Mahon as a witness, and (3) failed to object to comments made by the prosecutor during closing argument.

In response, the State argues that the district court erred in finding that Thomas was entitled to equitable tolling, as he failed to prove that extraordinary

circumstances prevented the timely filing of his petition and that he exercised reasonable diligence, and that, as such, the petition should be dismissed. We first address the equitable tolling issue before turning to the merits of the claims in Thomas's petition.

## A. Equitable Tolling

The State argues that the district court erred in finding Thomas was entitled to equitable tolling for two reasons. First, the State claims that Thomas did not pursue his rights diligently, as he did not file a *pro se* petition and he waited until eight months after his petition was dismissed as untimely to contact the district court. Second, the State contends that Thomas has not shown extraordinary circumstances because Bonner never abdicated her duty of loyalty to Thomas and, therefore, the agency relationship between them was not severed.

We review *de novo* the district court's "application of equitable tolling law to the facts." *Cadet v. Fla. Dep't of Corr.*, 853 F.3d 1216, 1221 (11th Cir. 2017). The district court's factual findings are reviewed for clear error, *id.*, and "[u]nder this standard, we must affirm a district court's findings of fact unless 'the record lacks substantial evidence' to support them," *San Martin v. McNeil*, 633 F.3d 1257, 1265 (11th Cir. 2011) (quoting *Lightning v. Roadway Express, Inc.*, 60 F.3d 1551, 1558 (11th Cir. 1995)).

The United States Supreme Court has held that AEDPA's statutory limitations period may be tolled for equitable reasons. *Holland II*, 560 U.S. at 645. However, "equitable tolling is an extraordinary remedy 'limited to rare and exceptional circumstances and typically applied sparingly.'" *Cadet*, 853 F.3d at 1221 (quoting *Hunter v. Ferrell*, 587 F.3d 1304, 1308 (11th Cir. 2009)). A petitioner is entitled to equitable tolling "only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland II*, 560 U.S. at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). The diligence and extraordinary circumstances requirements "are separate elements, both of which must be met before there can be any equitable tolling." *Cadet*, 853 F.3d at 1225.

### 1. Reasonable Diligence

We first turn to whether the district court correctly determined that Thomas was sufficiently diligent in pursuing his rights. In determining whether a petitioner has pursued his or her rights diligently, "[t]he diligence required . . . is reasonable diligence, not maximum feasible diligence." *Id.* at 1221 (quoting *Holland II*, 560 U.S. at 653); *accord Smith v. Comm'r, Ala. Dep't of Corr.*, 703 F.3d 1266, 1271 (11th Cir. 2012) ("[D]ue diligence . . . does not require a prisoner . . . to exhaust every imaginable option, but rather to make reasonable efforts." (alterations in original) (quoting *Aron v. United States*, 291 F.3d 708, 712 (11th Cir. 2002))).

29

"[T]he due diligence inquiry is an individualized one that must take into account the conditions of confinement and the reality of the prison system." *Smith*, 703 F.3d at 1271 (alteration in original) (quoting *Aron*, 291 F.3d at 712). For example, in *Downs*, we held that a petitioner had acted with reasonable diligence where he wrote to several attorneys "to express concern over the running of the AEDPA filing period and to urge the filing of his federal habeas petition" as well as "attempted to assist his attorneys in drafting his federal petition by providing them with either a draft petition or a list of issues to be included in the petition." *Downs*, 520 F.3d at 1323. Finally, a "determination regarding a party's diligence is a finding of fact that will not be disturbed unless clearly erroneous." *San Martin*, 633 F.3d at 1265 (quoting *Drew v. Dep't of Corr.*, 297 F.3d 1278, 1283 (11th Cir. 2002)).

Reviewing the record, the district court did not err in determining that Thomas had demonstrated reasonable diligence given the totality of the circumstances in his case. The district court found that Thomas actively communicated with Bonner about his case before and following her appointment as his counsel. On March 19, 2003, Bonner sent Thomas a letter informing him that he had "a few weeks" until the "2254 clock" ran in his case and that the Federal Public Defender advised her that Thomas should file a *pro se* § 2254 habeas petition and ask for her appointment. Bonner proposed that Thomas (1) "fill out the affidavit of Indigency and attach it to the [enclosed] 2254 motion," (2) "do the best that [he could] on the 2255 [sic],

30

explaining the situation to them and at least copying the issues which were raised in [his] 3.850 and ask for leave to amend after appointment of counsel," and (3) "[s]end them the letter which is enclosed to the Court indicating that [she] will accept appointment." On March 26, 2003, Bonner wrote to Thomas informing him that she was appointed. On April 10, 2003, Bonner again wrote to Thomas, telling him that "it would be better to file a Petition for Certiorari with the United States Supreme Court" and that she was "preparing the 2254 so that if the Petition for Cert is denied, we will be ready to file virtually immediately."

Then, on April 15, 2003, Bonner wrote to Thomas, stating, *incorrectly*, that "[f]rom what we can ascertain your 365 days for 2254 filing ran **before** your 3.851 petition was filed" and that, therefore, his petition was already untimely. (emphasis in original). Bonner also sent additional correspondence to Thomas concerning the status of his case on July 28, 2003 (where she again misrepresented that the deadline for filing the petition had passed "long ago"), August 27, 2003, and June 21, 2004 (where she notified Thomas that the State had challenged the timeliness of the petition, defended her filing decision, and incorrectly stated that the district court had given her time to develop a constitutional attack on AEDPA's limitations period).

The district court also found that, based on Thomas's testimony and his affidavit, Thomas completed the form habeas petition, signed it on April 3, 2003,

31

and returned it to Bonner after she was appointed as his counsel to file prior to the expiration of AEDPA's limitations deadline. Additionally, the district court found that Bonner did not advise Thomas of her plan to intentionally miss AEDPA's limitations deadline and that her deception dissuaded Thomas from doing more on his own in the case, as he trusted his experienced counsel to competently handle his case. Moreover, the district court found that Thomas was not even aware Bonner had not filed the petition until he had received a copy of the district court's September 25, 2006, order dismissing his petition.

The State, however, contends that Thomas failed to pursue his rights diligently by not filing a *pro se* petition with the district court, despite being specifically told to do so by Bonner, and by waiting several months to contact the district court following the dismissal of his petition as untimely. We find these arguments without merit. As the district court found, Thomas had no reason to believe that Bonner would deliberately ignore his directions to file his completed petition following her appointment as his counsel in order to pursue her personal goal of challenging AEDPA's limitations period, and Bonner's letters left Thomas with the impression that Bonner was still competently representing him and that time issues were "technical" and could be resolved later. And, as Thomas stated in both his letter to the district court and his sworn affidavit, he would have filed another form petition and mailed it to the district court prior to expiration of AEDPA's limitations period

32

had he known Bonner would not follow his directions to file the petition he sent her. As explained above, due diligence only requires a prisoner to make reasonable efforts to exercise his rights, not "exhaust every imaginable option." *See Smith*, 703 F.3d at 1271 (quoting *Aron*, 291 F.3d at 712).

Because there is substantial evidence in the record to support the district court's factual findings regarding Thomas's diligence, the district court's findings are not clearly erroneous. *See San Martin*, 633 F.3d at 1265. As such, and considering the facts of this case, we find that Thomas acted with reasonable diligence in pursuing his rights. *Cf. Downs*, 520 F.3d at 1323.

2. Extraordinary Circumstances

Having found that Thomas exercised reasonable diligence, we now must determine whether Thomas has demonstrated "extraordinary circumstances" that prevented the timely filing of his petition. In *Holland II*, the United States Supreme Court offered guidance on how courts should conduct the extraordinary circumstances analysis in determining whether a petitioner may be entitled to equitable tolling. *See* 560 U.S. at 650–54. Generally, "a garden variety claim" of attorney negligence, such as an attorney's simple miscalculation that leads to a missed filing deadline, does not warrant equitable tolling. *Id.* at 651–52 (quoting *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990)). However, the Supreme Court recognized that, "at least sometimes," an attorney's professional misconduct

33

could "amount to egregious behavior and create an extraordinary circumstance that warrants equitable tolling." *Id.* at 651. Indeed, the Supreme Court suggested that the misconduct of Holland's attorney in *Holland II* may have constituted an extraordinary circumstance, where the attorney (1) failed to timely file the petition "despite Holland's many letters that repeatedly emphasized the importance of his doing so," (2) did not do proper research about the proper filing date, (3) did not "inform Holland in a timely manner about the crucial fact that the Florida Supreme Court had decided his case," and (4) "failed to communicate with his client over a period of years, despite various pleas from Holland that [the attorney] respond to his letters." *See id.* at 652; *see also Cadet*, 853 F.3d at 1223.

In *Maples*, the Supreme Court revisited the question of when an attorney's misconduct may rise to the level of "extraordinary circumstances." Maples, an Alabama death-row petitioner, was represented by two New York attorneys as well as a local Alabama attorney recruited for the sole purpose of allowing the New York attorneys to be admitted *pro hac vice*. *Maples*, 565 U.S. at 274–75. While Maples's state postconviction petition was pending, the New York attorneys left their firm for other legal positions that left them unable to continue representing Maples. *Id.* at 270–71. The attorneys, however, neither notified Maples nor asked the state court for leave to withdraw nor moved for substitution of counsel. *Id.* at 275. As a result, Maples did not receive a timely notice of the denial of the postconviction petition

34

and, consequently, failed to timely appeal the ruling. *Id.* at 275–77. After exhausting his state court remedies, Maples sought federal habeas corpus relief. *Id.* at 278. The district court determined that Maples had defaulted the claims in his federal petition and that he had not shown "cause" to overcome that default, and a divided panel of this Court affirmed. *Id.* at 279.

The Supreme Court began its analysis in *Maples* by noting that "[c]ause for a procedural default exists where 'something *external* to the petitioner, something that cannot fairly be attributed to him[,] . . . 'impeded [his] efforts to comply with the State's procedural rule,'" and that a postconviction attorney's negligence does not qualify as "cause." *Id.* at 280 (alterations in original) (quoting *Coleman v. Thompson*, 501 U.S. 722, 753 (1991)). The Court explained that this proposition was based on "well-settled principles of agency," i.e., that "the principal bears the risk of negligent conduct on the part of his agent" and "the attorney is the prisoner's agent." *Id.* at 280–81 (quoting *Coleman*, 501 U.S. at 753–54). However, the Court explained that a "markedly different situation" occurs when "an attorney abandons his client without notice" because, by severing the principal-agent relationship, "an attorney no longer acts, or fails to act, as the client's representative." *Id.* at 281. Relying on *Holland II*, the Court found that, "under agency principles, a client cannot be charged with the acts or omissions of an attorney who has abandoned him," nor "can a client be faulted for failing to act on his own behalf when he lacks

35

reason to believe his attorneys of record, in fact, are not representing him." *Id.* at 283. As such, the Court found that the record showed that Maples's counsel had abandoned him, leaving him "without any functioning attorney of record" and, in effect, "reduced to *pro se* status." *See id.* at 288–89.

Subsequently, in *Cadet*, we applied *Holland II* and *Maples* to determine whether the professional misconduct of a petitioner's counsel rose to the level of extraordinary circumstances. *See* 853 F.3d at 1222–25. Cadet filed a *pro se* state habeas petition 311 days after his convictions became final, which tolled AEDPA's limitations period. *Id.* at 1219. Forty-nine days after the denial of that petition, which started AEDPA's limitations period running again, Cadet filed a *pro se* state postconviction motion, again tolling AEDPA's limitations period, and obtained counsel to represent him during the postconviction proceedings. *Id.* During the postconviction proceedings, Cadet had multiple discussions with his counsel about the limitations period and "became increasingly anxious about the federal limitations period," insisting that his counsel "file a § 2254 petition 'right away.'" *Id.* at 1219–20. However, Cadet's attorney repeatedly and incorrectly told Cadet that he had one year after the denial of his postconviction appeal to file the federal petition. *Id.* at 1220. Cadet's attorney ultimately filed the petition nearly a year after the state court's denial of Cadet's postconviction motion, and, as a result, the petition was untimely under AEDPA. *Id.* Cadet conceded the untimeliness of his petition but

36

argued that equitable tolling should apply based on his attorney's conduct. *See id.* at 1220–21. The district court dismissed Cadet's petition as time-barred. *Id.* at 1221.

On appeal, we assumed that Cadet's counsel's "misreading of § 2244(d) after his client expressed doubt amounted to gross negligence" but concluded that "attorney negligence, even gross or egregious negligence, does not by itself qualify as an 'extraordinary circumstance' for purposes of equitable tolling" based on our reading of *Holland II* in conjunction with *Maples*. *Id.* at 1225–27. Rather, we held that "either abandonment of the attorney-client relationship, such as may have occurred in *Holland [II]*, *or* some other professional misconduct *or* some other extraordinary circumstance is required" for a petitioner to be entitled to equitable tolling. *Id.* at 1227 (emphasis in original). We noted that, "[u]nder fundamental principles of agency law, the agency relationship between an attorney and his client can be severed, with the result that the client is not constructively charged with his attorney's knowledge or actions," e.g., when "the attorney actually abandons his client or purposely acts adversely to his client's interests or commits another serious breach of loyalty to his client." *Id.* at 1229. We explained that "[a]n agent is not deemed to have acted adversely to his principal's interests simply because he blundered and made an unwise, negligent, or grossly negligent mistake that harmed those interests," but rather, "only when he acts, or fails to act, for the purpose of advancing his own interests or those of a third party." *Id.*

Ultimately, we found that Cadet's attorney's "misinterpretation of the filing deadline and his failure to conduct any research into the matter," although grossly negligent, did not rise to the level where the attorney was "'acting adversely' to Cadet's interests" or had abandoned Cadet. *See id.* at 1233–34. "Abandonment denotes renunciation or withdrawal, or a rejection or desertion of one's responsibilities, a walking away from a relationship." *Id.* at 1234. We noted that Cadet's attorney "did not withdraw from representing Cadet, renounce his role as counsel, utterly shirk all of his professional responsibilities to Cadet, or walk away from their attorney-client relationship." *Id.* at 1234. Additionally, we found the case distinguishable from *Holland II* and *Maples*, as Cadet's attorney "did not fail to keep his client abreast of key developments in his case, did not fail to respond to his client's inquiries or concerns, and did not sever nearly all communication with his client for a period of years, or even for months, or even for weeks." *Id.* Finally, we emphasized that we "[did] not hold, or in any way imply, that abandonment [was] the only circumstance that can meet the extraordinary circumstance element for equitable tolling," as circumstances of "bad faith, dishonesty, divided loyalty, and mental impairment" may also rise to the level of an extraordinary circumstance. *Id.* at 1236.

Turning to Thomas's case, the district court found that "Bonner's pattern of intentional, unconscionable conduct . . . extends well beyond the gross negligence

38

described in *Cadet*—it reaches into the depths of abandonment" and that her "deliberate action of delaying the filing of the Petition was directly contrary to [Thomas's] instructions and adverse to his best interests." We agree. Here, the facts are more analogous to those in *Holland II* and *Maples* than *Cadet*. First, the parties stipulated to the fact that Bonner "had developed an interest in challenging the constitutionality of the AEDPA deadline based on her own belief that the one-year statute of limitations did not allow sufficient time for investigation and preparation of a petition for writ of habeas corpus" and had "deliberately delayed filing the petition in order to use [Thomas's] case as a test case to challenge AEDPA's statute of limitations."[2] Indeed, the record evidence supports this stipulation. Second, as the district court found, Bonner was dishonest in her letters to Thomas. Bonner never informed Thomas that her goal was to use his case as a "test case" to challenge AEDPA's limitations period and, to that end, to sacrifice Thomas's petition's timeliness and a guaranteed opportunity for federal review of his claims. Rather, Bonner intentionally misled her client by claiming that the timeliness issue was "technical" and would be later resolved once his petition was filed.

---

[2] Based on Bonner's testimony at the evidentiary hearing and her deposition, the State argues that the reason Bonner did not timely file Thomas's petition was due to the lack of meritorious claims therein and that, as such, Bonner was acting in furtherance of Thomas's interests. The State also contends that Bonner deliberately delayed the filing of the petition in order to extend Thomas's federal habeas proceedings, which the State claims benefited Thomas. However, the State stipulated to the fact that Bonner deliberately delayed the filing of the petition in order to challenge the constitutionality of AEDPA's limitations period, and we therefore reject these arguments.

Bonner's actions (and inaction) in this case rise far above the gross negligence of the attorney in *Cadet*. Bonner sacrificed Thomas's guaranteed opportunity of federal habeas review in order to pursue her own novel—and ultimately meritless—constitutional argument against AEDPA's limitations period. Bonner's personal goals not only failed to benefit Thomas (or other, non-party capital defendants), they were clearly adverse to his interests in the case. Considering the entire record, we find that Bonner acted in bad faith and abdicated her duty of loyalty to Thomas so that she could promote her own interests. Those interests were so adverse to those of her client that Bonner effectively abandoned Thomas. Thomas has therefore demonstrated extraordinary circumstances for the late filing of his petition.

Because Thomas demonstrated both reasonable diligence in pursuing his rights and extraordinary circumstances for the late filing of his petition, we find that Thomas is entitled to equitable tolling, and therefore address the claims he raises on appeal.

### B. Thomas's Claims

"When examining a district court's denial of a § 2254 habeas petition, we review questions of law and mixed questions of law and fact *de novo*, and findings of fact for clear error." *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1208 (11th Cir. 2007) (quoting *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005)). However, our review of a final state habeas judgment under AEDPA is

40

"greatly circumscribed and highly deferential to the state courts."  *Id.* (quoting *Crawford v. Head*, 311 F.3d 1288, 1295 (11th Cir. 2002)).

### 1. Claims that Are Procedurally Barred

Thomas contends that the district court erred in finding grounds two and three of his petition to be procedurally barred.  Thomas claims that the court misconstrued ground two as a claim that Thomas was denied effective assistance of counsel when "Nichols contrived to prevent review of his own ineffectiveness in [Rachel's murder] case by negotiating a plea agreement in [Thomas's mother's murder] case." Thomas contends that ground two was actually "a challenge to the State's use of the plea agreement to procedurally bar [Thomas's] guilt phase ineffectiveness claims." Additionally, Thomas contends that ground three was neither unexhausted nor procedurally barred, as he raised the claim in his Addendum to the Amended Postconviction Motion.  These arguments are without merit.

"Whether a particular claim is procedurally barred is reviewed *de novo*." *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1177 (11th Cir. 2010).  "A federal habeas claim may not be reviewed on the merits where a state court determined . . . that the petitioner failed to comply with an independent and adequate state procedural rule that is regularly followed."  *Philmore v. McNeil*, 575 F.3d 1251, 1260 (11th Cir. 2009).  To determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision, we consider: (1)

41

whether the last state court rendering a judgment in the case "clearly and expressly state[d]" that it relied on state procedural rules to resolve the federal claim without reaching its merits; (2) whether the decision "rest[s] solidly on state law grounds" and is not "intertwined with an interpretation of federal law"; and (3) the state procedural rule is adequate, i.e., not "applied in an arbitrary or unprecedented fashion." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)).

"[U]nder Florida law, a claim is procedurally barred from being raised on collateral review if it could have been, but was not raised on direct appeal." *Spencer*, 609 F.3d at 1179; *accord Philmore*, 575 F.3d at 1264. Applying this rule, the Florida Supreme Court routinely finds a claim not raised in a defendant's state postconviction motion to be procedurally barred. *See, e.g.*, *Green v. State*, 975 So. 2d 1090, 1104 (Fla. 2008); *see also Deparvine v. State*, 146 So. 3d 1071, 1094 (Fla. 2014); *Crain v. State*, 78 So. 3d 1025, 1038 n.8 (Fla. 2011). We have previously found these types of Florida procedural rules to be independent and adequate. *See, e.g.*, *Spencer*, 609 F.3d at 1179.

A procedural bar may be overcome, however, if the petitioner "demonstrates both cause for the failure to raise the claims on direct appeal and actual prejudice, or demonstrates that a 'failure to consider the claims will result in a fundamental miscarriage of justice.'" *Id.* at 1179–80 (quoting *Muhammad v. Sec'y, Dep't of*

42

*Corr.*, 554 F.3d 949, 957 (11th Cir. 2009)).  In order to establish cause, "a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court."  *Id.* at 1180 (quoting *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003)).  To demonstrate actual prejudice, the petitioner "must show that there is at least a reasonable probability that the result of the proceeding would have been different."  *Id.* (quoting *Henderson*, 353 F.3d at 892).  Finally, "[a] 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent."  *Id.* (alteration in original) (quoting *Henderson*, 353 F.3d at 892).

> Ground two of Thomas's petition states:
>
> The Sixth Amendment to the United States Constitution, through the Fourteenth Amendment, makes it clear that a lawyer owes a duty of loyalty to his client.  Not only can he not place another person's interests above those of his client, but he cannot take actions which protect his own interests at the expense of his client.  Richard Nichols was ineffective in his representation of William Gregory Thomas at the trial of the Rachel Thomas case. He then contrived to exonerate his own shortcomings by negotiating a plea agreement in the Elsie Thomas case so that his errors in the Rachel Thomas case could not be the subject of reversal or scrutiny.

Ground three of the petition states that "[i]f Mr. Nichols is not found to have suffered under an actual conflict of interest when he induced the plea of Mr. Thomas, the facts surrounding the plea establish ineffective assistance of counsel."

43

The district court found that the claims raised in grounds two and three were procedurally barred. The district court noted that Thomas first raised portions of grounds two and three in his postconviction appeal to the Florida Supreme Court, i.e., that Thomas's guilty plea waiver in his mother's murder case was not valid or, if it was valid, that Nichols was ineffective for recommending the plea. The district court agreed with the Florida Supreme Court's adjudication of those claims as procedurally barred for not being raised either in the direct appeal or in Thomas's Amended Postconviction Motion, noting that those procedural bars were regularly imposed and not applied arbitrarily. As to the other portions of the claims in grounds two and three, the district court found that they were never presented in state court and that "[i]t would be futile to dismiss this case to give [Thomas] the opportunity to exhaust these claims because they could have been raised before the trial court and/or on direct appeal and/or in a 3.850 motion."

Reviewing the state postconviction record, we find that the district court did not err in determining that grounds two and three of Thomas's petition were procedurally barred. None of the claims raised in grounds two or three were argued in Thomas's Amended Postconviction Motion and its Addendum. Rather, the only claim in those filings that relates to Thomas's plea in his mother's murder case concerned Nichols rendering ineffective assistance of counsel by not informing Thomas that the plea "could result in an aggravating circumstance in the penalty

44

phase of the murder trial relative to his wife." In his postconviction appeal to the Florida Supreme Court, Thomas argued for the first time that the court "should disregard the purported waiver because it is repugnant to the Constitution and the potential use of such waiver is repugnant to any honorable concept of ethics and professionalism," that the "only goal served by such waiver was to hide from errors made during the trial," and that, if the waiver was valid, the Florida Supreme Court "should determine whether Mr. Nichols failed to render effective assistance of counsel by making a recommendation regarding the plea that shields from review the errors committed during the guilt phase of the trial." The Florida Supreme Court found those arguments to be procedurally barred, as they should have been raised during Thomas's direct appeal or in his Amended Postconviction Motion. *Thomas II*, 838 So. 2d at 539.

As to ground two, Thomas could have challenged the constitutionality of the plea agreement barring his guilt-phase claims in the state postconviction court, as he was aware of the plea waiver when he filed his Amended Postconviction Motion.[3] *See Spencer*, 609 F.3d at 1179. Although Thomas contends that ground two should be construed as a "challenge to the State's use of the plea agreement to procedurally

---

[3] Thomas argues that he had no reason to argue against the application of the plea waiver for his guilt phase claims until after the State raised the waiver at the postconviction evidentiary hearing. We reject this argument, as the State introduced the plea agreement during sentencing and Thomas was aware that the State could enforce the plea's waiver provision. Thus, he could have argued against its application.

bar [Thomas's] guilt phase ineffectiveness claim," that argument was not presented in ground two, as the claims therein expressly relate only to Nichols's representation of Thomas. Moreover, even if Thomas's characterization of ground two was correct, Thomas did not raise this claim in his Amended Postconviction Motion.

As to ground three, Thomas contends that the claim is not procedurally barred because he argued in his Addendum that Nichols was ineffective for failing to inform Thomas that the plea agreement could be used as an aggravator during sentencing in Rachel's murder case, and, thus, the Addendum encompasses his claim in ground three of his petition. As such, Thomas claims that the Florida Supreme Court incorrectly determined that the claim was not argued to the state postconviction court. Again, Thomas's claim in the Addendum focused only on Nichols's alleged failure to inform Thomas about the consequences of the plea agreement as an aggravator during sentencing in Rachel's murder case, and Thomas separately raised that claim in grounds five and seven of his federal habeas petition. Thomas never argued in the Addendum that Nichols rendered ineffective assistance of counsel either for failing to object to the validity of the waiver after the State introduced the plea agreement during his sentencing or for facilitating the plea agreement that ultimately created "evidence" supporting an aggravator. Thomas could have raised these claims in his state postconviction motion but did not do so. *See id.*

46

Finally, Thomas has not demonstrated, or even argued, cause for excusing the procedural default of these claims, actual prejudice resulting from the procedural bar, or entitlement to the fundamental miscarriage of justice exception for these defaulted claims. *See id.* at 1180 ("Spencer has not argued, however, that there is any cause or prejudice to excuse his procedural default. . . . Nor, finally, does he claim that he is actually innocent. Accordingly, we cannot consider the first five claims of misconduct."). We therefore hold that the district court properly found grounds two and three to be procedurally barred.

2. Claims of Ineffective Assistance that Are Not Procedurally Barred

Thomas's claims that are not procedurally barred consist of three ineffectiveness claims raised in grounds five and seven of his petition. Under *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner who claims that he was denied effective assistance of counsel "must show that counsel's performance was deficient," which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, the petitioner "must show that the deficient performance prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial." *Id.* Because a petitioner is required to make both showings, *id.*, we "need not address the performance prong

47

if the petitioner cannot meet the prejudice prong, and vice-versa," *Ward v. Hill*, 592 F.3d 1144, 1163 (11th Cir. 2010).

To prove that counsel rendered deficient performance under *Strickland*, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." *Id.* "'Judicial scrutiny of counsel's performance must be highly deferential' and there is a 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Id.* at 1163–64 (alteration in original) (quoting *Strickland*, 466 U.S. at 689). Indeed, the test for deficient performance "is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Instead, the test is . . . whether what [counsel] did was within the wide range of reasonable professional assistance." *Id.* at 1164 (alterations in original) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995) (en banc)). In other words, "the petitioner must prove 'that no competent counsel would have taken the action that his counsel did take.'" *Id.* (quoting *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc)). Additionally, "the fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel." *Id.* Regarding the prejudice prong, the petitioner "must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable

probability is a probability sufficient to undermine confidence in the outcome.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 694).

Additionally, we give great deference to a state court's adjudication of ineffective assistance of counsel claims pursuant to AEDPA. Under 28 U.S.C. § 2254(d), for a federal court to grant habeas relief, the state court's adjudication of the claim must have "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*; *see also Harrington*, 562 U.S. at 97–98. To demonstrate that a state court's adjudication of a claim was based on an unreasonable determination of the facts, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155–56 (alteration in original) (quoting 28 U.S.C. § 2254(e)(1)). Finally, as the United States Supreme Court has explained, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," as both standards are highly deferential, and "when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *accord Knowles*, 556 U.S. at 123 ("The question 'is not whether a federal court believes the state court's determination' under the *Strickland*

49

standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007))).

We apply these principles to each of Thomas's ineffective assistance claims that are not procedurally barred.

(a) <u>Failing to Inform About the Plea Agreement's Use as an Aggravator</u>

Thomas argues that Nichols provided ineffective assistance of counsel by failing to inform Thomas that his guilty plea in his mother's murder case could be used as an aggravator for sentencing in Rachel's murder case. This claim is without merit.[4]

Here, the district court did not err in determining that the state postconviction court's adjudication of this claim was not contrary to or an unreasonable application of *Strickland* nor an unreasonable determination of the facts in light of the evidence. While Thomas testified that Nichols did not inform him that his plea in his mother's murder case could be used as an aggravator in his wife's murder case, Nichols testified otherwise, stating that he had a conversation with Thomas about the plea being used as an aggravator and that Thomas understood this fact. The state postconviction court denied Thomas's claim, determining that Thomas was

---

[4] Although the district court determined that this claim was procedurally barred, as Thomas did not raise it in his postconvicton appeal, the district court did not enforce the bar because the State did not raise it. We likewise reach the merits of this claim.

"properly informed by defense counsel" on the use of the plea agreement as an aggravator and finding that Nichols's testimony was more credible than Thomas's. Additionally, the state postconviction court noted that Thomas "appeared rehearsed, in that he answered many questions with the same answer," and "had lapses of memory in response to critical questions propounded by the State at the hearing."

Given the record, it was not unreasonable, under *Strickland* for the state postconviction court to find that Thomas had not shown deficient performance. As a result, we need not consider *Strickland's* prejudice prong, and we deny this claim.

### (b) Failing to Call Mahon as a Witness

Thomas also contends that the district court erred in affording deference under AEDPA to the state postconviction court's ruling that Nichols did not provide ineffective assistance of counsel when he failed to call Mahon as a witness. Specifically, Thomas claims that the primary motive advanced by the State for Rachel's murder was that Thomas was required to pay sums of money to his wife pursuant to a divorce judgment. Thomas argues that Mahon's testimony would have completely refuted that motive, as Mahon would have testified that Thomas had already given him the money with instructions to pay Rachel.

The district court denied this claim below, finding that "the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not

51

based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." Reviewing the record, we agree.

At the state postconviction evidentiary hearing, Nichols testified that he had a "general recollection" of speaking with Mahon but that he could not remember if he had spoken to Mahon again following that conversation. However, Nichols testified that he had considered calling Mahon to testify and had discussed that option with Thomas. Specifically, Nichols stated:

> I remember discussing with Mr. Thomas the issue about whether—about the State claiming that something to do with payment or avoiding payment or something of that nature would be a possible motive, and I remember having discussion with Mr. Thomas about whether or not it would be tactically wise to call a witness on that issue, and I recall his agreement that it would not be. And the thinking was I didn't believe that the jury would think that was actually a motive, didn't think that his proof that it didn't take place or that was any proof that would show that that was not a motive would be of real significance to the jury, and he and I agreed not to call . . . any witnesses in that regard.

Nichols further testified that "[w]ithin the context of the trial, whether or not Mr. Thomas had paid those monies," i.e., pecuniary gain as a motive for the murder, "was not a point of any real significance." Nichols stated that it was a tactical decision not to call Mahon, as it preserved a closing argument during the guilt phase and the issue of whether Thomas had paid Mahon "was of no real consequence" in the penalty phase. Additionally, Nichols testified that Thomas had made the ultimate decision not to call Mahon during either phase of his trial after Nichols advised Thomas of his opinion on the pecuniary gain aggravator. Nichols also explained

52

that the State had presented other motives for why Thomas had committed the murder. Thomas, however, testified that Nichols never told him about the discussion he had with Mahon, never gave him a choice in calling Mahon as a witness, never discussed with him that a custody fight or pecuniary gain could be used as a motive for the murder, and never discussed any theory of defense with him.

The state postconviction court denied this claim, determining that Nichols did not render ineffective assistance of counsel by not calling Mahon as a witness. The state postconviction court found Nichols to be "more credible and more persuasive than [Thomas's] allegations." The court found that it was Nichols's and Thomas's joint tactical decision to not call Mahon as a witness and that because Thomas agreed to this course of action, he could not claim ineffective assistance of counsel based upon that joint decision. The Florida Supreme Court reviewed this claim on appeal and found no error, as the state postconviction court's factual findings were "supported by competent substantial evidence in the record and its rulings comport[ed] with the applicable law." *Thomas II*, 838 So. 2d at 541.

We find the Florida Supreme Court's adjudication of this claim was not contrary to or an unreasonable application of *Strickland*. First, the record supports the state court's determination that Thomas ultimately agreed not to call Mahon as a witness after discussing the possibility with Nichols and that this was not deficient

performance under *Strickland*, and Thomas has not rebutted the presumption of correctness of the state court's factual findings.

Second, Thomas has failed to demonstrate that the state court unreasonably applied *Strickland* in finding no prejudice from the failure to call Mahon as a witness. Indeed, there is no reasonable probability that, but for the failure to call Mahon, Thomas would have received a life sentence. *See Harrington*, 562 U.S. at 104. When determining whether the prejudice prong of *Strickland* is satisfied, this Court considers "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh[s] it against the evidence in aggravation." *Rose v. McNeil*, 634 F.3d 1224, 1242 (11th Cir. 2011) (quoting *Porter v. McCollum*, 558 U.S. 30, 41 (2009)). At the state postconviction hearing, the state prosecutor explained that the primary financial motive the State was proceeding on was that Thomas, "over the long-term, did not want to have to pay [his ex-wife] child support, wanted custody of the child," and that "there was a secondary theory that . . . if he couldn't have his wife that nobody could." Mahon testified that he had nothing to do with Thomas's child support payments to his wife. Furthermore, the state trial court found that four additional aggravators were proven in the case other than that the murder was committed for financial gain. *See Thomas I*, 693 So. 2d at 951 n.1. As the Florida Supreme Court explained in Thomas's direct appeal, there was "relatively minor mitigation" presented compared to the "massive"

54

evidence of aggravation in the case. *See id.* at 953. Thus, even if Mahon's testimony resulted in the pecuniary gain aggravator not being found, there is no reasonable probability that Thomas would have received a sentence other than death based on the disparity between the aggravation and mitigation evidence in the case. *Cf. Rose*, 634 F.3d at 1246. Accordingly, we deny this claim.

### (c) Failing to Object to Improper Closing Statements

Finally, Thomas claims that the district court erred in giving deference to the state postconviction court's determination that Nichols was not ineffective when he failed to object to comments made by the prosecutor during the penalty phase's closing argument. Thomas claims that the comments Nichols failed to object to are improper under Florida law and the state postconviction court's adjudication of this claim was therefore an unreasonable application of *Strickland*.

During the penalty phase's closing argument, the prosecutor argued:

> During this trial all the Defendant's rights have been honored. What rights of Rachel did he honor? He plundered those rights. He trampled those rights. Did he charge Rachel with a crime? Did he convene a grand jury and have them charge her with a crime? Did he give Rachel a trial before he executed Rachel? Did he convene a jury to listen to aggravating and mitigating?
>
> No, that defendant was arresting officer, he was judge, he was jury, he was executioner. . . .

Subsequently, the prosecutor argued:

> In closing I am going to ask you that if you are tempted to show this Defendant some mercy, sympathy or pity I want to leave you with

55

this thought and that is I am going to ask you to show that defendant the same mercy, the same compassion, the same sympathy that he showed to Rachel.

In his Amended Postconviction Motion, Thomas argued that these comments violated his right to a fair trial, as they went "beyond the bounds of fair comment and persuasion" and "urged the jury to consider improper factors that were outside the scope of jury's deliberations," and that Nichols's failure to object was ineffective assistance of counsel.  At the state postconviction evidentiary hearing, Nichols testified about his philosophy on objections, explaining that:

> If you look at the entire record, no lawyer can maintain any credibility with a jury if they're jumping up and down every word or two that goes on and many times it will be tactically beneficial . . . .
>
> [S]ometimes when you let a prosecutor do something that may be objectionable, it may create an opportunity for you to make a more beneficial point or more effective point in your response to them.
>
> Many times I've sat still and watched prosecutors do things that I knew were objectionable, . . . but tactically I thought to allow them to do it and then . . . it would beneficially effect [sic] my response.  I think that . . . happens all the time in trials.

Nichols also addressed the specific comments at issue in this case, testifying that:

> I can't remember tactically why I didn't object at that time, whether it was something I wanted to respond to, and I think there was. – [sic] I believe that the argument show this defendant the same mercy he showed the victim is an improper argument, but there are many things, as I explained before, that might be otherwise objectionable that you allow to be said so that you can respond to it . . . .
>
> The tactical reason was, I believe, although I can't remember exactly what I was thinking that many years ago, is that when those kind of

56

statements are made I think that they are offensive. I think they're offensive to a jury and sometimes I allow prosecutors to go ahead and make them so I can make a response to it in my rebuttal, and I'm sure that it would have been my intention to do it that way here.

In denying this claim, the state postconviction court found that "a tactical reason existed" for Nichols's lack of objection to the comments and that Thomas had failed to show that the decision was not reasonable. The Florida Supreme Court similarly rejected Thomas's argument that Nichols had provided ineffective assistance of counsel in not objecting to these comments. The court concluded that although "several of the prosecutor's comments . . . were improper," the state postconviction court did not err in rejecting the ineffectiveness claim. *Thomas II*, 838 So. 2d at 542 n.8.

When reviewing this claim, the district court also found that some of the comments were improper. However, the district court determined that it was required to give the decision deference under AEDPA, as the adjudication of the claim "was not contrary to clearly established law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented." We agree with the district court's resolution of this claim.

Generally, "[a] prosecutor's comments during a closing argument are evaluated to determine whether the comments so unfairly affected the trial as to deny the defendant due process, when considered 'in the context of the entire trial in light

57

of any curative instructions.'" *Parker v. Allen*, 565 F.3d 1258, 1273 (11th Cir. 2009) (citation omitted) (quoting *United States v. Abraham*, 386 F.3d 1033, 1036 (11th Cir. 2004)).  Thomas contends that, under Florida law, the prosecutor's comments during closing were improper, and that similar prosecutorial comments in two other Florida cases, *Urbin v. State*, 714 So. 2d 411 (Fla. 1998), and *Brooks v. State*, 762 So. 2d 879 (Fla. 2000), resulted in resentencing.  In *Urbin*, the Florida Supreme Court found a similar "mercy argument" made by a prosecutor to be improper.  *See* 714 So. 2d at 421–22.  However, the Florida Supreme Court's basis for remand in *Urbin* was based on the proportionality of the defendant's sentence, not the improper prosecutorial comments.  *See id.* at 418.  In *Brooks*, the Florida Supreme Court found the prosecutor's mercy argument comments to be "blatantly impermissible" and that the unobjected-to comments, viewed in conjunction with the objected-to comments and the close seven-to-five sentencing recommendation by the jury, amounted to fundamental error.  *See* 762 So. 2d at 901 (quoting *Urbin*, 714 So. 2d at 421).  However, the Florida Supreme Court did not find the comments challenged in this case to be fundamental error in either *Thomas I* or *Thomas II*.  *See Thomas II*, 838 So. 2d at 542 n.8; *Thomas I*, 693 So. 2d at 951 n.2, 953 n.4.

While some of the prosecutor's closing comments were improper in this case, we find that the Florida Supreme Court's adjudication of this claim was not an unreasonable application of *Strickland*.  Indeed, Thomas has not demonstrated how

it was unreasonable for the state postconviction court to conclude that there was no prejudice under *Strickland*, i.e., a reasonable probability that the outcome in his sentencing would have been different but for the failure to object to those comments. *See Harrington*, 562 U.S. at 104. As explained above, there was extensive evidence of aggravation and minimal evidence of mitigation presented during the penalty phase. *Cf. Strickland*, 466 U.S. at 700 ("Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed."). For example, there was evidence that Thomas murdered his own mother to prevent her from talking to police about his wife's death. *Thomas I,* 693 So. 2d at 953. Additionally, the State introduced numerous inculpatory statements that Thomas made to other witnesses concerning the planning and carrying out Rachel's murder. *See id.* at 951, 952 n.3.

Accordingly, we deny this claim, as the state court's adjudication was not contrary to or an unreasonable application of *Strickland* nor an unreasonable determination of the facts.

## III.   CONCLUSION

Because Thomas has demonstrated that he exercised reasonable diligence in ensuring his habeas petition was timely filed and that extraordinary circumstances prevented the filing of his petition, he is entitled to equitable tolling. We affirm the

district court's order denying Thomas's petition on the merits, as his claims are either procedurally barred or without merit.

**AFFIRMED.**

ED CARNES, Circuit Judge, concurring:

I concur in the majority opinion. I also "concur" in the district court's thorough and well-reasoned order concluding that equitable tolling is justified in this case, and especially in this finding:

> Considering the entire record, the Court finds that Ms. Bonner was dishonest with her client, and she acted in bad faith and with divided loyalty. Her intentions were her own — which were contrary to Petitioner's interests. Thus, Petitioner has shown extraordinary circumstances, because Ms. Bonner's bad faith, dishonesty, and divided loyalty resulted in her "effectively abandoning" her client.

Doc. 236 at 37. Fortunate it is that an attorney's bad faith, dishonesty, and divided loyalty are not ordinary circumstances but truly extra-ordinary ones.

61