[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13907

_____

STEWART PARNELL,

            Petitioner-Appellant,

*versus*

UNITED STATES OF AMERICA,

            Respondent-Appellee.

_____

Appeals from the United States District Court
for the Middle District of Georgia
D.C. Docket Nos. 1:19-cv-00153-WLS,
1:13-cr-00012-WLS-TQL-1

_____

2              Opinion of the Court      22-13907; 23-11786

_____

No. 23-11786

_____

MICHAEL PARNELL,

Petitioner-Appellant,

*versus*

UNITED STATES OF AMERICA,

Respondent-Appellee.

_____

Appeals from the United States District Court
for the Middle District of Georgia
D.C. Docket Nos. 1:19-cv-00035-WLS,
1:13-cr-00012-WLS-TQL-2

_____

Before WILLIAM PRYOR, Chief Judge, LUCK, and ED CARNES, Circuit
Judges.

CARNES, Circuit Judge:

This consolidated appeal is from the district court's denial
of the 28 U.S.C. § 2255 motions that Stewart and Michael Parnell
each filed seeking relief from their convictions involving food

safety, or the lack thereof.  We granted certificates of appealability (COAs) on issues involving their claims of ineffective assistance of counsel arising from the decision not to seek a change of venue based on a presumption of jury prejudice due to pretrial publicity and community hostility.  Because the Parnell brothers have failed to establish that their counsel's performance was deficient, we affirm the denial of § 2255 relief.

## I. BACKGROUND

Stewart Parnell is the former president and owner of Peanut Corporation of America (PCA).  The company made peanut products at its plant in Blakeley, Georgia and sold them to food producers across the country.  *See United States v. Parnell*, 723 F. App'x 745, 747 (11th Cir. 2018).  Stewart's brother Michael Parnell was a broker who managed the sales of peanut paste to one of PCA's main customers, the Kellogg Company.[1] *Id.*

In 2009 federal authorities, including the Food and Drug Administration (FDA), identified PCA's Blakely production plant as the source of a nationwide salmonella outbreak.  *Id.*  The company's professed practice was to test for bacteria using samples from each lot of peanut product before shipping it to a customer.  *Id.*  According to agreements with several customers, PCA was required to attach a "Certificate of Analysis" to each outgoing lot to certify that lot had tested negative for bacteria.  *Id.*

---

[1] Because they share the same last name, we will sometimes refer to Stewart and Michael Parnell by their first names.

There was enough evidence at their trial to prove beyond a reasonable doubt that Stewart and Michael Parnell knowingly distributed untested peanut products with fraudulent Certificates of Analysis and they failed to inform customers when they later discovered those lots had tested positive for bacteria. *Id.* at 747–48. There was also enough evidence to prove beyond a reasonable doubt that Stewart kept retesting product that had tested positive for bacteria until he got a negative result, and he knowingly shipped product that had tested positive. *Id.*

The results were dire. The infected peanut products resulted in a salmonella outbreak that caused more than 700 illnesses across the country and reportedly caused nine deaths. *See id.* There were also economic impacts, especially in southwest Georgia. The region around Albany, Georgia (including Blakeley) grows about 60% of the peanuts produced in the entire country, which is why the region is often called the "peanut capital of America." A peanut broker from Albany testified at a hearing on Stewart's § 2255 motion that the salmonella outbreak "devastated" the peanut industry there.

## II. PROCEDURAL HISTORY

In connection with the salmonella outbreak at the plant, the Parnells were indicted on numerous counts. Their joint trial was held in the division and district where the crimes were alleged to have occurred: the Albany Division of the Middle District of Georgia. The trial lasted 34 days including deliberations.

The jury convicted Stewart on 67 of the counts that charged him with: introduction into interstate commerce of adulterated food in violation of 21 U.S.C §§ 331(a) and 333(a)(2); introduction into interstate commerce of misbranded food in violation of 21 U.S.C §§ 331(a) and 333(a)(2); conspiracy to introduce into interstate commerce adulterated and misbranded food in violation of 18 U.S.C. § 371; mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349; and obstruction of justice in violation of 18 U.S.C. § 1505. He was acquitted of one wire fraud count.

Michael was convicted of 31 counts that charged him with: introduction into interstate commerce of misbranded food in violation of 21 U.S.C §§ 331(a) and 333(a)(2); conspiracy to introduce into interstate commerce misbranded food in violation of 18 U.S.C. § 371; mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; and conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349. He was acquitted of 12 counts that charged him with introduction into interstate commerce of adulterated food in violation of 21 U.S.C §§ 331(a) and 333(a)(2).

The court sentenced Stewart to 336 months in prison and Michael to 240 months. *Parnell*, 723 F. App'x at 748. Both of them appealed, and in a joint opinion this Court affirmed every count of their convictions and each of their sentences. *Id.* at 747.

After their direct appeals were over, each of the Parnell brothers filed a 28 U.S.C. § 2255 motion. In their separate motions they each claimed, among other things, that they were entitled under *Skilling* to a trial in a different venue due to a presumption that the jurors in the venue where their crimes occurred were prejudiced against them. *See Skilling v. United States,* 561 U.S. 358 (2010). That decision sets forth factors relevant to determining whether a defendant has established a presumption of jury prejudice that entitles him to a change of venue. *See id.* at 382–84. But counsel for the Parnells made a strategic decision not to move for a change of venue under *Skilling* or otherwise. That decision, each of the Parnells claimed in his § 2255 motion, was outside "the wide range of reasonable professional assistance," depriving him of effective assistance of counsel within the meaning of *Strickland v. Washington*, 466 U.S. 668, 689 (1984).

The magistrate judge assigned to the § 2255 motions held a two-day hearing on Stewart's motion, and another two-day hearing on Michael's. At his hearing Stewart called as witnesses all four of his trial attorneys. At his hearing Michael called as witnesses both of his trial attorneys and also called two of Stewart's trial attorneys. Based in large part on the attorneys' testimony, the magistrate judge issued a recommendation in each proceeding that the § 2255 motion be denied. Each recommendation included findings of fact and conclusions of law. Among other things, the magistrate judge concluded that neither defendant had "refuted the testimony from his counsel that the decision not to file a motion to change

22-13907; 23-11786     Opinion of the Court                7

venue was sound trial strategy." The district court agreed and entered separate orders denying each of the § 2255 motions.

In its denial orders the district court found that the decision of the two teams of attorneys not to seek a change of venue was reasonable; there was no performance deficiency. The court also found that the brothers' attempt to satisfy the *Strickland* prejudice requirement of their ineffectiveness claims by establishing presumed jury prejudice under *Skilling* failed. It entered judgment denying the § 2255 motions.

### III. THE CERTIFICATES OF APPEALABILITY

Michael and Stewart each sought to appeal the denial of his § 2255 motion. This Court issued a COA in each case allowing the parties to brief two questions:

> 1. whether the district court erred in determining that [Stewart and Michael] could not establish a presumption of jury prejudice, based on adverse pretrial publicity, under *Skilling v. United States,* 561 U.S. 358 (2010); and

> 2. whether a showing of presumed jury prejudice, under *Skilling,* operates to establish both prongs of an ineffective assistance of counsel claim, based on counsels' failure to move for a change in venue.

### IV.    DISCUSSION

Our decision in a nutshell is this. The answer to the first COA issue does not matter because we answer the second one:

"No, a presumption of jury prejudice under *Skilling* does not bring with it a presumption of deficient performance under *Strickland*." And, the Parnells cannot show deficient performance. The non-nutshell version of our opinion follows.

### A. Whether the Existence of a *Skilling* Presumption of Jury Prejudice Would Dispense with the Need to Show Deficient Performance under *Strickland*

This appeal from the denial of the Parnell brothers' § 2255 motions does not involve a question of whether a motion for change of venue was wrongly denied by the trial court. It couldn't because no motion for a change the venue was filed, which is the point of the brothers' ineffective assistance of counsel claim.

The Parnells' contention is that their counsel were ineffective for not seeking a change of venue, which they say could have been obtained by establishing available grounds for a *Skilling* presumption of jury prejudice. They couple that with the argument that any attorney who does not take advantage of the *Skilling* presumption to get the trial moved is automatically guilty of deficient performance and ineffective assistance of counsel. Or, as Stewart puts it in his brief, when a motion to change venue would be successful under *Skilling,* "no attorney functioning as the Sixth Amendment requires" can strategically choose *not* to file that motion.

And that is so, the brothers say, regardless of the attorney's reason for not seeking to change venue. In effect, the Parnell's position is that the *Skilling* presumption establishes a presumption of

jury prejudice so emphatically that it not only demonstrates that the defendant was prejudiced under *Strickland* by his attorney's decision not to move to change venue; it also washes over and erases the deficient performance requirement of an ineffective assistance of counsel claim. No tactical or strategic reason can possibly matter. The net effect of allowing an ineffective assistance claim to succeed in those circumstances would mean that a petitioner or movant could prevail on some ineffective assistance claims by showing only one component, which would be *Skilling* presumptive prejudice.

Not according to the Supreme Court. In laying down the ground rules of modern-era ineffective assistance law, the Court instructed us that: "Failure to make the required showing of *either* deficient performance *or* sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700 (emphasis added). That is why the Court held that "there is no reason for a court deciding an ineffective assistance claim . . . even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697; *accord, e.g., Bilotti v. Fla. Dep't of Corr.*, 133 F.4th 1320, 1329 (11th Cir. 2025) ("[W]e need not address both prongs of the *Strickland* inquiry if a petitioner fails to satisfy one."); *Bishop v. Warden, GDCP*, 726 F.3d 1243, 1254 (11th Cir. 2013) ("The Supreme Court also made clear in *Strickland* that a court need not address both prongs if the petitioner has made an insufficient showing on one of them . . . ."); *Holladay v. Haley,* 209 F.3d 1243, 1248 (11th Cir. 2000) ("[T]he court need not address the performance prong if the

defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

Both deficient performance and prejudice must be shown. Both are essential. The reason they are, the Supreme Court has explained, is that: "Unless a defendant makes both showings, it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687; *see also id.* at 691–92 ("The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding.").

The Supreme Court rejected the ineffective assistance claim in *Strickland* because the petitioner had "made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance." *Id.* at 700. The petitioner had also failed to make the required showing of prejudice. *Id.* The Court called it "a double failure" but reiterated that a single failure — either not showing performance deficiency *or* not showing prejudice — is enough to doom an ineffective assistance claim. *Id.* ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.").

Attempting to escape the inescapable force of all of that precedent, the Parnells argue that not taking advantage of *Skilling* presumed jury prejudice to move the trial is a "structural" error because "the right to a fair and impartial venire is a fundamental trial

22-13907; 23-11786      Opinion of the Court                    11

right."  But attempting to frame the issue as a "structural error" does not relieve the Parnells of their burden of showing deficient performance as part of their ineffective assistance of counsel claim. "[T]he term 'structural error' carries with it no talismanic significance as a doctrinal matter." *Weaver v. Massachusetts*, 582 U.S. 286, 299 (2017).  "It means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was 'harmless beyond a reasonable doubt.'" *Id.* (citation omitted).

In the *Weaver* case the Supreme Court addressed "what showing is necessary when the defendant . . . raises [an unpreserved structural error] in the context of an ineffective-assistance-of-counsel claim," and decided that: "To obtain relief on the basis of ineffective assistance of counsel, the defendant as a general rule bears the burden to meet two standards," i.e., "deficient performance" and "prejudice." *Id.* at 299–300; *see also id.* at 303 (adopting "the assumption that petitioner ha[d] shown deficient performance by counsel" and proceeding to the question of prejudice).

In the *Morris* case, we rejected a § 2254 petitioner's ineffective assistance claim arising from his exclusion from a bench conference, which he characterized as "a structural error."  *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1126–29 (11th Cir. 2012).[2]  We

_____

[2] The Parnells' ineffective assistance of counsel claims were brought in 28 U.S.C. § 2255 motions, not in a 28 U.S.C. § 2254 habeas petition.  But it doesn't matter.  Our decisions on constitutional issues raised in § 2254 proceedings are binding precedent in § 2255 proceedings involving materially identical facts; they are as controlling in a later § 2255 case as they would be in a later § 2254 case. *See. e.g., Scott v. United States*, 890 F.3d 1239, 1247 n.2 (11th

held that his claim nonetheless failed because he did not carry his burden under *Strickland* of showing "both deficient performance and prejudice." *Id.*; *see also Meadows v. Lind*, 996 F.3d 1067, 1077–81 (10th Cir. 2021) (rejecting a § 2254 petitioner's ineffective assistance claim based on an alleged structural error because, even if the court assumed the error was structural, the petitioner failed to satisfy "both the performance and prejudice prongs from *Strickland*").

For all of these reasons, we hold that a § 2255 movant asserting an ineffective assistance of counsel claim cannot skip over the deficiency component or fold it into the prejudice component of the claim just because a *Skilling* presumption of jury prejudice could have been established. And if there is no performance deficiency, there can be no ineffective assistance of counsel based on counsel's action or inaction, regardless of prejudice. The answer to the second COA question is an unequivocal, unconditional "No." And that is true regardless of what the answer is to the first COA question.

---

Cir. 2018) ("[The prior decision] involved a petition filed under 28 U.S.C. § 2254, whereas Scott's motion arises under § 2255. We have recognized that precedent interpreting one of these parallel restrictions is instructive for interpreting its counterpart.") (quotation marks omitted); *see also Gonzalez v. Sec'y for Dep't of Corr.*, 366 F.3d 1253, 1262 (11th Cir. 2004) (en banc) (We don't distinguish between cases before this Court "based upon whether they involve state prisoners and § 2254 law or federal prisoners and § 2255 law, because there is no material difference in the relevant statutory language, or in how the issues arising from that language should be resolved.") (citation omitted), *aff'd sub nom., Gonzalez v. Crosby*, 545 U.S. 524 (2005).

We assume, without deciding, that the Parnells could establish a presumption of jury prejudice under *Skilling*. We can do that because the answer to the first COA question does not matter in this case. It doesn't matter because, as we are about to discuss, the Parnells have not established that the failure to file a motion to change venue was deficient performance. Like every other movant or petitioner claiming ineffective assistance of counsel, they must clear the hurdle that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgement," *Strickland*, 466 U.S. at 690. And "trial counsel's error must be so egregious that no reasonably competent attorney would have acted similarly." *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1239 (11th Cir. 2011); *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) ("[A] petitioner must establish that no competent counsel would have taken the action that his counsel did take.") (footnote omitted).

**B. Whether the Decision Not to Request a Change of Venue Was Constitutionally Deficient Performance under the *Strickland* Decision**

That brings us to the Parnell brothers' alternative position. They contend that even if the failure of trial counsel to move for a change of venue when he has a *Skilling* presumptive prejudice opportunity doesn't meet the *Strickland* deficiency requirement in every case, it does here. They argue that trial counsel's failure to move for a change of venue amounts to deficient performance in the old-fashioned, non-presumptive, non-automatic way, because

irrespective of *Skilling* the decisions of their counsel not to move for a change of venue fell outside the wide range of reasonable professional assistance.

### 1. Expansion of the COA

The threshold problem with the Parnell's alternative contention is that this straight-out performance deficiency issue is not specified in the COA, and we ordinarily confine ourselves to issues that are. *See, e.g.*, *Hodges v. Att'y Gen., State of Fla.*, 506 F.3d 1337, 1341–42 (11th Cir. 2007); *Murray v. United States*, 145 F.3d 1249, 1250–51 (11th Cir. 1998). We could decide not to decide it. But we have discretion to expand a COA, at least where the added issue is intertwined with, subsumed in, or closely related to the original issue, and the parties are given an opportunity to address it or have already done so. *See, e.g., Rozzelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1009 (11th Cir. 2012); *Clark v. Crosby*, 335 F.3d 1303, 1307 (11th Cir. 2003).

The issue of whether the Parnells' trial counsel performed deficiently by not requesting a change of venue was addressed by the parties in this § 2255 proceeding: in the district court before the evidentiary hearing in each case; in the district court after the evidentiary hearing in each case; in the parties' briefs to us; and at oral argument. The magistrate judge in his report and recommendation in each case addressed this issue. It was decided against the Parnells by the district court. And it is closely related to the issues on which we granted a COA.

Given all of those circumstances, we exercise our discretion to expand the COA to decide if the failure of counsel to seek a change of venue was outside the wide range of reasonable professional assistance, amounting to performance deficiency, which is a component of a successful ineffective assistance of counsel claim. And to decide ineffective assistance of counsel issues, we consider all of the relevant facts and circumstances leading to the challenged decision. *See Strickland*, 466 U.S. at 688 ("[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.").

## 2. Presumed Prejudice under *Skilling*

As we have said, for the Parnells to prevail on their ineffective assistance of counsel claim, they must show that it was outside of "the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, for their attorneys to decide not to move for a change of venue under *Skilling*. To put their attorneys' decision in context, we begin with a more thorough discussion of *Skilling*.

The Constitution prescribes that a criminal trial will take place in the "State and district wherein the crime shall have been committed." U.S. Const. amend. VI (providing right to criminal jury trial); *see also id*. art. III, § 2, cl. 3 (providing for trial "in the State where the . . . Crimes . . . have been committed"). "The Constitution's place-of-trial prescriptions, however, do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial — a

16                  Opinion of the Court      22-13907; 23-11786

basic requirement of due process." *Skilling,* 561 U.S. at 378 (quotation marks and citation omitted).

*Skilling* sets forth four factors for courts to consider when determining whether a defendant, if he requests a change of venue, is entitled to one due to a "presumption of prejudice" in the assigned venue. *See id.* at 377, 382–84. Those factors are: (1) "the size and characteristics of the community in which the crime occurred"; (2) whether pretrial publicity contained a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"; (3) the length of time between the crime and the trial, and any change in the "decibel level of media attention" in that time; and (4) whether the defendant was acquitted of any charges. *Id.* at 382–84. The first three factors can be considered and weighed before trial. The fourth factor can be put in the mix only after trial in an appeal or post-conviction proceeding.

The Supreme Court did not indicate that those factors were the only ones that courts should consider, or that any single factor was dispositive. (And it explicitly declined to decide "whether a presumption of prejudice can be rebutted, and, if it can, what standard of proof governs that issue." *Id.* at 385 n.18.) What the Court did is weigh the four factors together to determine whether in the *Skilling* case itself a presumption of jury prejudice had been established. *Id.* at 382–85. It decided one had not been.

The *Skilling* decision is not on-point authority for the Parnell brothers. It did not involve an ineffective assistance of counsel

claim. The question addressed was not whether trial counsel in that case in order to render effective assistance were required to file a motion for a change of venue based on pretrial publicity and community hostility. The attorneys in *Skilling* actually did file a motion to change venue. It was denied. The question before the Supreme Court was whether the trial court had erred in denying the venue motion. And the Court held that the facts in the *Skilling* case did *not* justify a presumption of prejudice or otherwise require that the judgment be reversed because the motion for a change of venue had been denied. 561 U.S. at 384–85.

The *Skilling* approach is not well-suited for evaluation by trial attorneys (or a trial judge) trying to assess the merits of a motion to change venue based on presumed jury prejudice. Instead, it is designed for and best suits appellate review. One factor that the Supreme Court identified as "of prime significance" in *Skilling* is whether the defendant was acquitted of any charges. *See id.* at 383. Trial counsel, of course, cannot possibly consider that supremely significant factor before the verdict comes in, which is too late for venue motions.

### 3. The Media Coverage

One factor that goes into whether a defendant can make the necessary showing for a change of venue is the nature and amount of local media coverage preceding the trial. That also informs the related inquiry into whether an attorney's decision not to seek a change of venue amounted to ineffective assistance of counsel. But there's more than that. The decision whether a trial attorney's

"identified acts or omissions were outside the wide range of professionally competent assistance" must be made "in light of all the circumstances." *Strickland*, 466 U.S. at 690. So we will look at the facts and circumstances relating to the trial counsel's deliberate decision not to move for a change of venue.

National and local media outlets covered the salmonella outbreak involving the PCA plant, the indictments stemming from it, and the trial that followed. Asserting that media coverage was prejudicial against them, in their briefs the Parnells identify 17 specific news reports that they consider relevant to their claim that their counsel should have moved for a change of venue.

Fourteen of those 17 news items (that is, all but three) were old news by the time of trial. They were published between January 2009 and March 2010, more than four years before the July 2014 trial began. Those articles reported on the human toll of the outbreak and its negative impact on the peanut-focused economy of southwest Georgia, provided updates on the federal investigation into PCA, and described allegations that PCA executives knowingly shipped contaminated peanut products. Only one of the 14 old news articles that were excerpted in their appellate briefs identified Stewart or Michael by name. A February 18, 2009 article named Stewart but not Michael.[3]

---

[3] The Parnells did not introduce in the § 2255 proceedings most of the news reports they cited in their briefs to the district court and to this Court. Instead, in their briefs they quoted parts of those news accounts and included hyperlinks to the news sources, most of which are inaccessible to non-

22-13907; 23-11786     Opinion of the Court                    19

The only three news reports highlighted by the Parnells that were not old news by the time of trial were published in the period from April 2014 through the beginning of jury selection in July of that year. Those news reports mentioned both Parnells by name, discussed the illnesses and deaths caused by the salmonella outbreak, and provided factual information about the start of the trial.[4]

### 4. The Two Teams of Experienced Attorneys

---

subscribers. Stewart also filed a document with the district court that lists headlines and hyperlinks for another 250-or-so news reports from 2009 through 2019. As best we can tell, the content of those articles is substantively the same as the 17 reports addressed in the Parnells' briefing. But many of those links are also inaccessible to non-subscribers. The government asserts that it can access only 147 of the approximately 250 of them.

It is the Parnells' burden to establish that they are entitled to relief and to marshal sufficient evidence to meet their burden of proof. *See Weaver*, 582 U.S. at 299 (explaining that in a federal collateral attack the petitioner "bears the burden" of meeting the requirements to establish relief on an ineffective assistance of counsel claim); *Lynch v. Sec'y, Fla. Dep't of Corr.*, 776 F.3d 1209, 1220 (11th Cir. 2015) ("As with all ineffective assistance claims, [the defendant or petitioner] has the burden of showing that his counsel's performance (or non-performance) was both deficient and prejudicial.").

[4] Those three news reports were: (1) an April 25, 2014 article in *Food Safety News* describing Stewart and Michael's roles at PCA (and inaccurately identifying Michael as vice president of the company); (2) a July 28, 2014 report that ran on Channel 10 WALB (Albany Georgia's NBC and ABC affiliate), which stated that the trial was starting and also linked nine deaths to the outbreak; (3) and a July 30, 2014 article in Blakeley's *Early County News* noting the commencement of jury selection and the deaths and illnesses caused by the outbreak.

Experience counts.  The presumption that an attorney's strategic decision was reasonable is "even stronger" when we "examin[e] the performance of an *experienced* trial counsel" because "[e]xperience is due some respect." *Lawrence v. Sec'y, Fla. Dep't of Corr.*, 700 F.3d 464, 478 (11th Cir. 2012) (emphasis added) (quotation marks omitted); *see id.* at 467, 473–74, 477–79 (rejecting an ineffective assistance argument on the performance prong and noting that trial counsel "were both experienced criminal defense lawyers" with over 50 years of combined experience); *Walls v. Buss*, 658 F.3d 1274, 1279 (11th Cir. 2011) ("We begin with the strong presumption that counsel's conduct was reasonable, and that presumption is even stronger when we examine the performance of experienced counsel.") (quotation marks and citation omitted); *Chandler*, 218 F.3d at 1316 ("When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.") (footnote omitted); *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) (rejecting a habeas petitioner's ineffective assistance claim based on failure to move to change venue due to pretrial publicity, and stating: "Our strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel"); *Spaziano v. Singletary*, 36 F.3d 1028, 1040 (11th Cir. 1994) (concluding that a defendant failed to satisfy the *Strickland* performance prong where his trial counsel "had thirty years [of] experience" and noting that we consider "the experience of the attorney") (quotation marks omitted); *Rogers v. Zant*, 13 F.3d 384, 387 (11th Cir. 1994) (rejecting ineffective assistance claim and noting that "counsel were

longtime local lawyers who knew their community"); *Birt v. Montgomery*, 725 F.2d 587, 600–01 (11th Cir. 1984) (en banc) (concluding that defendant failed to establish the performance deficiency prong and considering in reaching that decision defense counsel's "extensive trial experience"); *Fleming v. Kemp*, 748 F.2d 1435, 1447 (11th Cir. 1984) (deciding to reject the § 2254 petitioner's ineffective assistance claim based on his attorney's failure to move for change of venue, and reaching that decision in part because of the attorney's "considerable experience").

The Parnell brothers retained lawyers who had a lot of experience litigating cases. The defense team for Stewart Parnell was headed by Thomas Bondurant. At the time of the trial he had more than 33 years litigation experience, including service as a federal prosecutor. There were three other attorneys on Stewart's defense team: Ken Hodges who had 23 years litigation experience; Scott Austin who had 17 years litigation experience; and Justin Lugar who had six years litigation experience. That's a total of 79 years of experience behind Stewart's defense.

Ed Tolley was the lead attorney for Michael Parnell. At the time of the trial, he had 39 years of litigation experience. He was joined by Devin Smith who had been a litigator for four years. That's a total of 43 years of experience behind Michael's defense.

Combined, the six attorneys on both teams representing the Parnell brothers had a total of 122 years of litigation experience.

### 5. The Close Collaboration of the Two Defense Teams

The two defense teams did not have a formal joint defense agreement, but they might as well have. At the § 2255 motion hearings Bondurant testified that the attorneys representing the two Parnells had "consulted each other" on "everything." Tolley agreed that they "cooperated" and "had a good bit of collaboration." Lugar testified that the attorneys on the two teams had "coordinated" with each other, especially on the question of whether to seek a change of venue. And that question was "a constant topic of conversation" among the attorneys, Bondurant testified.

Given how closely the two defense teams worked together on the venue question, how they freely shared information and insight about it, and how they arrived at the same decision about it, we will treat their decision not to file a motion for a change of venue as a joint one.

### 6. The Investigation into Whether to Seek a Change of Venue

The two defense teams put a lot of time and thought into whether they should try to have the trial moved to another venue. They tracked the media's coverage of the case. Stewart's attorneys Bondurant and Lugar observed that the press coverage had intensified after the outbreak, slowed down for several years, and then built back up ahead of trial. Michael's attorney Tolley and Stewart's attorney Austin saw nothing in the press coverage that led them to believe their clients could not get a fair trial in the Albany Division of the Middle District of Georgia, where the case was scheduled for trial. Tolley "thought the media attention in Albany

was so, so," meaning it lacked the intensity of the "media crush" he had seen in other cases.

In addition to following the media coverage, both defense teams took other steps to gauge the sentiment of the community where the case was scheduled for trial. Stewart's team hired a retired FBI agent as investigator who interviewed witnesses from Stewart's peanut plant and the local peanut industry so that the attorneys could "understand what was going on in the peanut world," Lugar testified. And Lugar recounted how that investigator "drove around and tried to talk to as many people" as possible "about the case" and "what they knew specifically about the case." Some of the attorneys also personally travelled to the community to speak with local people and insiders in the peanut industry. Lead counsel Bondurant made five separate trips to Albany in advance of the trial.

As for Michael's attorneys, Tolley went so far as to physically move to Blakely before the trial, where he "absorbed the people and what they thought and what they had to say." Among other things, it helped him form a judgment about whether a potential juror "who may have heard something" about the case could "put that thought aside." Tolley also testified that "we spent a lot of time looking at social media" and that it "informed us of so many things about these jurors. It was really very useful."

Bondurant noted that the two defense teams also relied on the particular knowledge that two of the attorneys, one on each team, with ties to the area, brought to the table: Stewart's lawyer

Hodges and Michael's lawyer Tolley. Born and raised in Albany, Hodges knew the area well. He was familiar with "the case's impact on the local economy," and he shared with the other attorneys "what [he] was hearing in [the] community." Tolley had "practiced law all over Georgia" and was "very familiar with Albany." After living in Blakeley for a period before the trial, Tolley testified: "I had a lot of sense of the community and how people felt . . . , not just this case but about things in general."

The Parnells argue that their two teams of experienced attorneys should have conducted their investigation into the venue question differently. Among other things, they criticize their trial counsel for not conducting a formal survey of the jury pool, for not hiring a jury consultant to advise them, and for hiring an investigator from out of state instead of a local one. They have not shown what a formal survey would have revealed that was not otherwise known, or what a consultant would have advised them, or what a different investigator would have found that the one they hired did not.

All the Parnells have shown is that they would not have conducted the same investigation in the same way that the two teams of trial counsel, with all of their cumulative experience, did. They would have done some things differently. That's hardly surprising. As the Supreme Court pointed out to us in *Strickland*: "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689; *see also id.* at 688

(proscribing any "particular set of detailed rules for counsel's conduct"); *id.* at 689 (disavowing "the existence of detailed guidelines for representation"); *id.* at 690 (warning against "[i]ntensive scrutiny of counsel and rigid requirements for acceptable assistance").

The Court also described the duty to investigate as "a duty to make reasonable investigations." *Id.* at 691; *see also Holladay*, 209 F.3d at 1251–52 ("Counsel have a duty to investigate but this duty is confined to reasonable investigation."); *Rutherford v. Crosby*, 385 F.3d 1300, 1313 (11th Cir. 2004) ("[U]nder *Strickland* the duty is to investigate to a reasonable extent. . . ."). The standard is reasonable investigations, not exhaustive ones or perfect ones. *Bilotti*, 133 F.4th at 1334 ("The test is not whether the best criminal defense attorneys might have done more, but whether some reasonable attorney could have acted, in the circumstances, as [this attorney] did.") (alterations and quotation marks omitted); *Thomas v. Att'y Gen., Fla.*, 992 F.3d 1162, 1187 (11th Cir. 2021) (same); *Jenkins v. Comm'r, Alabama Dep't of Corr.*, 963 F.3d 1248, 1269–70 (11th Cir. 2020) ("[O]ur deferential review under *Strickland* does not ask whether counsel could possibly or ideally have been more effective. The test for ineffectiveness is not whether counsel could have done more.") (quotation marks omitted); *see also Rogers*, 13 F.3d at 386 ("A jury trial is, by its nature, an enterprise that is filled with imponderables from the viewpoint of a trial lawyer" and "[t]he truth is that it is often hard for even a good lawyer to know what to do.").

26              Opinion of the Court        22-13907; 23-11786

We have made it clear that we accord counsel a high degree of discretion in deciding how far to investigate a potential defensive strategy. *See Mills v. Singletary*, 63 F.3d 999, 1021 (11th Cir. 1995) ("A decision to limit investigation is accorded a strong presumption of reasonableness.") (quotation marks omitted).

The investigation that the two experienced defense teams conducted into possible prejudice against the defendants in the assigned venue was reasonable and reasonably thorough.[5]

### 7. The Decision the Defense Teams Reached Not to File a Motion to Change Venue, and their Reasoning Behind It

While they retained the right to reconsider the decision after jury *voir dire* was conducted, the conclusion that counsel reached before then was that it was not in their clients' best interests to file a motion to change venue. According to attorney Bondurant, the

---

[5] Michael asserts that he was uniquely prejudiced by the jury's exposure to the media's coverage of his case because (1) no peanut products for which he was personally responsible — i.e., those shipped to the Kellogg Company — resulted in deaths, rendering news of deaths resulting from the outbreak especially unfair to him; and (2) media reports about him were "inaccurate" (meaning that a single article incorrectly identified him as vice president of PCA). We have no reason to doubt that Michael's counsel had access to those facts based on their investigation and reasonably assigned them their proper weight as part of the broader calculus on whether to move to change venue. See *Strickland*, 466 U.S. at 690 ("[A] court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."). It is Michael's burden to prove otherwise, *see Weaver*, 582 U.S. at 299; *Lynch*, 776 F.3d at 1220, and he has not done so.

22-13907; 23-11786      Opinion of the Court                27

lawyers for both Stewart and Michael "were all on board" with the decision "to keep the case" in the assigned venue.  All six defense attorneys testified unambiguously that the decision not to move for a change in venue was a "deliberate" and "strategic" choice. The district court credited their testimony that it was a deliberate decision made for strategic reasons.  *See also Tafero v. Wainwright*, 796 F.2d 1314, 1321 (11th Cir. 1986) ("We find that trial counsel, on voir dire of the jury, adequately investigated the possibility of potential prejudice against [the defendant], and [counsel's] decision not to seek a change of venue was a strategic decision.").

In reaching their strategic decision to stay in the Albany Division the attorneys considered how certain defenses would play with different types of jurors.  A defense under active consideration by both sets of attorneys was "government overreach." The theme of that defense would be that the federal government was primarily responsible for the economic fallout following the salmonella outbreak because it had over-regulated the peanut industry and then unfairly scapegoated the Parnells.  Both defense teams concluded that the rural Albany Division was a good place to put forward a government overreach defense. And they did put forward that defense.

Stewart's attorney argued to the jury during his closing argument that "the entire federal prosecution" was "biased . . . by the FDA civil inspection," that an FDA inspector landed on Stewart as the "ideal person" to blame for a situation where "someone had to be held responsible," and that Stewart "got caught up in the

changing guidelines, the changing rules of food safety, and got caught in the middle of something that someone had to make a scapegoat for." Michael's attorney told the jury during his closing argument that "the government was all over this food processing plant just like it's been . . . over everybody else's food processing plant," and he stated: "[T]here are 300,000 regulations regulating small businesses in this country."

As Stewart's attorney Bondurant explained, in his experience "a defense argument like that plays better in a rural area," where "there seems to be more mistrust of the government." Attorney Austin testified that the defense's "idea" was to "get maybe one or two people who were in that [peanut] industry who thought, you know, this wasn't PCA's fault, this was FDA's fault." He believed that their odds of selling that defense were better in a jurisdiction familiar with "peanut farming and peanut manufacturing." Michael's attorney Smith testified that the Albany Division — where potential jurors "were experienced in the peanut industry and agriculture generally" — was well-suited for a government overreach defense. Michael's defense team believed that peanut-savvy jurors in that venue were as likely to blame the government for the economic consequences of the outbreak as they were likely to blame the Parnells.

The preference of the attorneys for a jury pool that had experience with agriculture was bolstered by their belief that it was likely the government would present evidence of unsanitary conditions at the Blakeley plant. They thought that jurors from the

Albany Division— a rural community familiar with the realities of food production — would likely be more forgiving to the Parnells about conditions at the plant.  Attorney Bondurant explained they wanted the trial in a place "that knew the peanut business" because there, "we might catch a break or two from a juror who understood where Stewart was coming from."  Austin, another of Stewart's attorneys, testified that the decision not to seek a change of venue was based in part on their "hope . . . that we would get folks who were familiar with rural manufacturing, food manufacturing, maybe even some folks in the peanut industry."

Michael's attorney Tolley also wanted a "rural" jury who "understood the world of peanuts," and he believed that "production folks" from southwest Georgia would empathize with Michael's position in the food industry.  Likewise Michael's attorney Smith believed a benefit to a trial in the Albany Division was that jurors there "would understand the realities of food production."

In keeping with their strategic thinking, the defense teams were wary of taking the risk that the trial would be transferred to a more urban or suburban locale.  Bondurant feared that a juror from "suburbia" would "immediately react very adversely" to evidence of unsanitary conditions in a peanut plant.  Tolley stated that he didn't think his client "had a chance with urban jurors," a belief that factored into the strategic decision not to seek a change of venue.

The attorneys also considered the likelihood of success on a motion to change venue.  Both defense teams researched motions for change of venue and familiarized themselves with the

applicable standard.  Both teams included an attorney who had personal experience moving to change venue: Hodges for Stewart, and Tolley for Michael.  And both teams doubted that a motion to change venue would be meritorious in the case of either defendant. Michael's attorney Tolley testified that he "just did not see the type of publicity, the type of angst, the type of pressure" that could justify a change in venue.  Tolley said: "I didn't think we met the standard."  Neither did Stewart's attorney Bondurant, who noted "it was a very high standard to meet."

But whether they were entitled to a change of venue if they sought one is beside the point.  The point is that the two defense teams did not want a change of venue.  They didn't want to try the case elsewhere.  As Stewart's attorney Austin explained, his "concern" about filing a motion to change venue was not so much that the motion lacked merit — it "was that it would be granted."  And Michael's attorney Tolley agreed, testifying: "[W]e really thought that [the venue in the Albany Division] provided an advantage, not a disadvantage . . . ."  When the decision was made not to move for a change of venue, none of the six defense attorneys representing the two defendants disagreed with that strategic decision.  It was unanimous.

### 8. The Voir Dire Proceedings

The case proceeded to trial in the Albany Division of the Middle District of Georgia.  Jury selection lasted four days.  About 60% of the panel of potential jurors — 47 out of 78 — put their hands up when the court asked if they had any familiarity with the

22-13907; 23-11786    Opinion of the Court    31

case. Individual questioning in the judge's chambers revealed that 11 of those venirepersons had heard that the outbreak resulted in deaths.[6] Two of those 11 individuals (Jurors No. 37 and No. 84) were ultimately selected to be on the jury. Both of them agreed that they could set aside anything they had heard about the case before trial and vowed that they had not yet begun to form an opinion about any defendant's guilt or innocence.

The statements of three potential jurors, made outside the hearing of the other potential jurors, indicated their possible animosity toward the Parnells. Potential Juror No. 46 stated inside the court's chambers that his co-workers told him the defendants "should be held responsible for the deaths," but he said he personally had no opinion about their guilt. Potential Juror No. 48 informed the court that his wife had told him someone should be "hang[ed]" as a result of the outbreak. And Potential Juror No. 127 (a third-generation peanut farmer) said he wished he could "extract [his] pound of flesh" from the Parnells. None of those potential jurors served; the government struck Potential Juror No. 46 for

---

[6] That fact is relevant to the venue issue because Stewart Parnell filed a motion in limine, which Michael Parnell joined, to preclude the government from introducing evidence that people had become ill and some had died as a result of the salmonella outbreak. The court denied the motion insofar as evidence of illnesses was concerned, finding that evidence had substantial probative value and was not unduly prejudicial. After the government agreed not to introduce any evidence of deaths caused by the outbreak, the court saw no need to rule on that part of the motion in limine, and it didn't. At trial "[t]he jury heard evidence that the salmonella outbreak caused at least 700 illnesses," but not evidence that it caused deaths. *See Parnell*, 723 F. App'x at 748.

problems with his "inattentiveness," and the court dismissed Potential Jurors No. 48 and 127 for cause.

When Stewart and his attorney Bondurant left the courthouse later on the day that Potential Juror No. 127 (the one who referenced a "pound of flesh") was dismissed, they saw him outside the parking garage sitting in his truck, first looking in their direction and then driving around the garage. Even though he had already been dismissed, Potential Juror No. 127 also returned to the courthouse the next day. There is no indication that any member of either defense team had any reason to believe that the dismissed potential juror had communicated his feelings to any of the other jurors. And no indication in the record that he had actually done so.

The six defense attorneys kept thinking about the venue issue through jury *voir dire* and the start of the trial. Stewart's attorney Hodges testified in the § 2255 hearing that, at the time the jury was selected, he had no reason to doubt the jurors' assertions that they could be impartial. Michael's attorney Tolley testified: "I never thought we had gotten to the point where a motion to change venue would have actual merit." When the trial began, the two defense teams were still convinced that the trial was where they wanted it to be.[7]

---

[7] Hodges, one of Stewart's four trial attorneys, testified at Stewart's evidentiary hearing that "in retrospect," the "correct thing" to have done would have been "to move for a change of venue." That testimony does not indicate that the decision not to move for a change of venue was unreasonable

22-13907; 23-11786    Opinion of the Court    33

Defense attorneys were aware that the media was reporting the salmonella outbreak had resulted in deaths, which was information they thought might reach the jury pool. But as Michael's attorney Tolley testified, he had no reason to doubt that the jurors "could put [that information] out of their mind" and remain fair and impartial. And in the view of Stewart's attorney Austin, accepting jurors with potential knowledge of the deaths involved "a cost benefit analysis" tied to their preference to try the case in the Albany Division. Seating a jury with some exposure to the fact that several deaths had occurred was, as he put it, "a necessary risk to take to get the type of people that we wanted[,] and you kind of take the good with the bad."

As to dismissed Potential Juror No. 127 (who wanted to "extract" a "pound of flesh") the attorneys agreed that he was not representative of the jury pool. Stewart's attorneys Bondurant and

_____

at the time it was made. *See Harrington v. Richter*, 562 U.S. 86, 109–10 (2011) ("After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland,* however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind."); *Chandler*, 218 F.3d at 1316 ("In reviewing counsel's performance, a court must avoid using the distorting effects of hindsight and must evaluate the reasonableness of counsel's performance from counsel's perspective at the time. It is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.") (alteration adopted) (quotation marks omitted) (citations omitted) (footnote omitted).

Austin, and Michael's attorneys Tolley and Smith, all described that venireperson as an "outlier." Stewart's attorney Lugar said that Potential Juror No. 127's "behavior that day was inconsistent with what [he] perceived to be the sort of general atmosphere that [he] had seen prior to that point." In any event, that potential juror was dismissed and prevented from serving on the jury. And so was Potential Juror No. 48 (whose wife had said someone should be "hang[ed]"). Attorney Tolley observed that the voir dire process had worked like it should, resulting in the dismissing of that potential juror. That voir dire process also resulted in the dismissal of Potential Juror No. 46 (whose co-workers told him the defendants "should be held responsible for the deaths").

### 9. Analysis and Decision of the Performance Deficiency Issue

Turning to the performance deficiency question, "the test is whether some reasonable attorney could have acted, in the circumstances, as these two [teams of attorneys] did — whether what they did was within the 'wide range of reasonable professional assistance.'" *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995) (en banc) (quoting *Strickland*, 466 U.S. at 689). It is not enough to claim that some or most other attorneys would have acted differently than trial counsel did. *Id.* at 1522 ("Three different defense attorneys might have defended Waters three different ways, and all of them might have defended him differently from the way the members of this Court would have, but it does not follow that any

counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance.").

The Supreme Court has insisted that in applying the test for reasonable effectiveness, we indulge "a strong presumption . . . that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689 (quotation marks omitted), *accord, e.g., Cullen v. Pinholster,* 563 U.S. 170, 191 (2011); *Bell v. Cone,* 535 U.S. 685, 698 (2002). And it has insisted that we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *accord, e.g., Burt v. Titlow,* 571 U.S. 12, 23 (2013); *Harrington,* 562 U.S. at 104. Another directive of the Supreme Court is that: "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. That's important because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful to conclude that a particular act or omission of counsel was unreasonable." *Id.*; *accord, e.g., Premo v. Moore,* 562 U.S. 115, 122 (2011); *Harrington,* 562 U.S. at 105. The gist of it is that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland,* 466 U.S. at 690; *accord, e.g., Knowles v. Mirzayance,* 556 U.S. 111, 124 (2009); *Tharpe v. Warden,* 834 F.3d 1323, 1343 (11th Cir. 2016).

The unanimous decisions of the two defense teams not to seek a change of venue for the Parnells, even if one was theirs for the asking, was a strategic decision. And they made that decision with awareness of the law and after a thorough investigation of the plausible options. They carefully investigated pretrial publicity and community attitude. *See supra* at 22–26. And nothing they learned during their investigations and nothing they heard during jury *voir dire* changed their minds.

After all was said and done leading up to the trial and during jury *voir dire*, the six attorneys on the two defense teams, who had a combined litigation experience of 122 years, each reasonably believed that his client would have a better chance with a jury selected from the Albany Division of the Middle District of Georgia than in some other venue to which the case might be transferred. *See supra* at 26–30. As a strategic decision made after a reasonable investigation, their decision is "virtually unchallengeable." *Strickland*, 466 U.S. at 690. The instructions of the Supreme Court are that we must presume that their decision might be considered a sound strategy and that it falls within the wide range of reasonable professional assistance. *See id.* at 689. Doing that, we cannot hold that the attorneys provided ineffective assistance of counsel on the venue question.[8]

---

[8] Michael and Stewart also point to evidence that emerged after trial showing that additional jurors and alternate jurors were exposed to news that deaths resulted from the salmonella outbreak. The court and the defense attorneys already knew during voir dire that two jurors had heard about the

22-13907; 23-11786    Opinion of the Court    37

Our holding is reinforced by a number of our previous cases involving venue decisions that attorneys made when facing circumstances similar to those faced by the attorneys defending the Parnell brothers.

### a. The *Weeks* decision

One of those decisions is *Weeks v. Jones*, 26 F.3d 1030 (11th Cir. 1994). The habeas petitioner, Weeks, had abducted a veterinary student in Macon County, Alabama, robbed him of his vehicle, tied his feet and hands together, put a pillowcase over his head, and shot him at close range. *Id.* at 1033, 1047. After burying the victim's body in a shallow grave, Weeks had fled to Ohio where a policeman pulled him over for a traffic violation and asked to see his driver's license. *Id.* at 1033. He responded by shooting the officer with the same pistol he had used to murder the student in

---

deaths, but new evidence showed that more jurors and alternate jurors knew about the deaths than the court and attorneys had realized. *See Parnell*, 723 F. App'x at 748–49. That issue was the subject of the Parnells' motion for a new trial.

Those facts do not affect our decision. This Court has already ruled in the direct appeal that the jurors' exposure to that same extrinsic evidence posed no reasonable possibility of prejudice to the Parnells. *See Parnell*, 723 F. App'x at 749–51. And no matter what new information came to light after the trial, it cannot affect the reasonableness of the venue decision made before the trial began. *See Strickland*, 466 U.S. at 690 ("[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.").

Alabama. *Id.* Weeks was tried in Macon County, convicted of capital murder, and sentenced to death. *Id.* at 1033, 1036.

One of the claims that Weeks raised in his federal habeas petition was that his trial counsel was guilty of ineffective assistance for not seeking to move the trial out of Macon County because of the prejudicial news coverage about the murder there. *Id.* at 1046 n.13. In a post-conviction hearing, trial counsel had testified that he "made a strategic decision not to move the trial from Macon County because, based on experience, he thought that Weeks had the best chance for acquittal there." *Id.* He explained: "Weeks best shot was here in Macon County. Macon County has a history of bending over backwards for defendants. It's a jurisdiction — it's good to practice in if you're a defense lawyer." *Id.* (alteration adopted).

In affirming the district court's denial of federal habeas relief, we reasoned that "this is the type of tactical decision that the Supreme Court has recognized that a criminal defendant's counsel may elect as a reasonable choice considering all of the circumstances and has cautioned courts against questioning." *Id.* (citing *Strickland,* 466 U.S. at 688–89).

So it is here. As in *Weeks,* defense counsel (all six of them) made a strategic decision not to try to move the trial to a different venue because what their investigation and experience led them to believe was that the Parnell brothers had their best shot at acquittal where the case was instead of elsewhere. *See supra* at 19–34.

b. The *Provenzano* Decision

In *Provenzano* the habeas petitioner had been scheduled to stand trial on a charge of disorderly conduct. *See Provenzano v. State*, 497 So. 2d 1177, 1179–80 (Fla. 1986). Feeling aggrieved by the charge, he smuggled guns into the Orange County, Florida courthouse and started shooting. *See id.* at 1180, 1184. He killed one person and wounded two others. *Id.* at 1180. Tried and convicted of murder and two counts of attempted murder, he was sentenced to death. *Id.* at 1179. After going through the state courts and the district court, the case came to us on Provenzano's appeal from the denial of his federal habeas corpus petition. *See Provenzano v. Singletary*, 148 F.3d 1327, 1328 (11th Cir. 1998).

At the pretrial stage of the state proceedings in *Provenzano*, the trial judge had "stated he was inclined to grant a change of venue [based on pretrial publicity] if one were properly requested." *Id.* at 1329. All Provenzano's trial counsel had to do was ask. *See id.* But "counsel deliberately chose for strategic reasons not to request that the venue be changed." *Id.* They had been told that any change in venue would "involve a trial in St. Augustine" and counsel "preferred the trial to be held in Orlando," where it was scheduled. *Id.* at 1330. They preferred to stay put because the defense was going to be insanity, and they believed "an Orlando jury would be more receptive to such a defense than a more conservative one in St. Augustine." *Id.*

We agreed with the state courts and the district court that "the strategic choice Provenzano's trial attorney[s] made not to pursue a change of venue was well within the broad boundaries of

reasonableness staked out by decisional law in this area." *Id.* at 1332. We pointed out that, "[w]e reached the same decision in *Weeks,*" *id.*; and we reiterated our observation that this type of strategic decision was the kind that the Supreme Court had recognized as "a reasonable choice considering all of the circumstances and has cautioned courts against questioning," *id.* (quoting *Weeks,* 26 F.3d at 1046 n.13) (quotation marks omitted).

We added in *Provenzano* that "[o]ur strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel." *Id.*; *see also Spaziano,* 36 F.3d at 1040 ("[T]he more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in rejecting a defense without substantial investigation was reasonable under the circumstances.") (quoting *Gates v. Zant,* 863 F.2d 1492, 1498 (11th Cir. 1989)). The two attorneys who had defended *Provenzano* at trial were experienced criminal defense counsel, leading us to conclude, "We will not second guess their considered decision about whether Provenzano stood a better chance, however slim it may have been, with a jury in Orlando than with a jury in St. Augustine." *Provenzano*, 148 F.3d at 1332.

So it is here. As in *Provenzano,* the two teams of experienced trial counsel who represented the Parnell brothers could have gotten a different venue (or so we are assuming) if they had sought one. But, like the trial attorneys in *Provenzano,* they didn't seek one because they made a considered decision that their clients stood a better chance, however slim it might be, in the Albany Division of

the Middle District of Georgia than in some undetermined other location. We will not second guess that decision here just as we didn't second guess the similar decision of trial counsel there. *See id.*

### c.  The *Baldwin* Decision

In *Baldwin* the habeas petitioner had been convicted of capital murder and sentenced to death for a highly publicized crime committed in Monroe County, Alabama. *See Baldwin v. Johnson*, 152 F.3d 1304, 1308–09, 1313–14 (11th Cir. 1998). The district court denied the petitioner's claim that his trial counsel had rendered ineffective assistance by failing to move for a change of venue. *See id.* at 1314. The reason the attorney did not want the venue changed is that "he thought that Baldwin had a better chance in Monroe County because at the time [counsel] knew all the jurors." *Id.* (quotation marks and ellipsis omitted). He elaborated that "there was not a single member of that jury panel that he did not know, and he knew their background and knew their families," and he thought that was an advantage for him and for his client. *Id.* (alterations adopted) (quotation marks omitted). We affirmed the denial of habeas relief because trial counsel's "decision was clearly a tactical one that was reasonable under the circumstances." *Id.*

So it is here. As in *Baldwin*, counsel for the Parnell brothers made a strategic decision not to move for a change of venue because of the advantages offered by trying the case in the Albany Division of the Middle District of Georgia. And that was a reasonable decision under the circumstances. *See id.*; *see also Fleming*, 748

F.2d at 1447 (holding that forgoing a motion to move a trial from where the murder took place when defense counsel had "considerable experience trying cases there, many as prosecutor," which he believed "enabled him to choose a 'favorable' jury," was an exercise of "reasonable professional judgment," not ineffective assistance); *Rolling v. Crosby*, 438 F.3d 1296, 1299 (11th Cir. 2006) (Even though there was a "large amount of publicity surrounding this case from the early stages of the proceedings," it was not unreasonable for the state supreme court to reject an ineffective assistance claim where the petitioner's experienced attorneys initially "made an informed, tactical decision not to seek a change of venue" because "the educated and open-minded citizenry of [that county] made it the best venue for the penalty phase of a capital case."); *id.* at 1301 (recognizing that the attorneys reasonably believed at the time that a jury from the "medical community" where the case was set to be tried was more likely to consider favorably mitigating circumstance evidence of mental health problems).

### 10. Conclusion

More than three decades ago, this Court observed in its *Spaziano* opinion: "Because it is a 'wide range' of performance that is constitutionally acceptable, the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between. Cases in which deliberate strategic decisions have been found to constitute ineffective assistance are even fewer and farther between." *Spaziano*, 36 F.3d at 1039 (citation and some quotation marks omitted). We added: "This case

is not one of them." *Id.* We repeated that observation and that remark in our *Provenzano* opinion. *See* 148 F.3d at 1332.

So it is here. This case involves a challenge to a carefully conceived and thoroughly thought-out strategic decision made by two teams of experienced counsel after a full investigation. It is not one of those rare, few and far between cases in which we will second guess their strategic decision and find that they performed outside the wide range of reasonable professional assistance. *See id.* They did not.

The judgments of the district court denying the ineffective assistance of counsel claim in each of the Parnell brothers' § 2255 motions are AFFIRMED.